William Clark **BRYAN, Jr.,** Appellant,

v.

**The STATE of Texas,** Appellee.

No. 39638.

Court of Criminal Appeals of Texas.

May 25, 1966.

Rehearing Denied Oct. 5, 1966.

Luther F. Hardin, John T. Nicholson, Rosenberg, John K. Gresham, Richmond, for appellant.

Leon B. Douglas, State's Atty., Austin, for the State.

## OPINION

BELCHER, Commissioner.

The conviction is for murder; the punishment was assessed at death.

On February 18, the deceased, Luther Douglas Price, operated a drive-in grocery store which was adjacent to a service station. The station operator last saw the deceased about 9:30 p. m. at the store; next, he saw a Cadillac parked in front of the store but never saw it leave, and before 10 p. m. he was alerted when customers of the store found it unattended with the cash register open, and on being unable to locate the deceased, the officers were notified.

The appellant was seen in the vicinity of the store about 9:30 p. m. February 18, with a .22 caliber pistol and driving a Cadillac.

Later, about midnight, a man used the telephone at a residence to call a taxi, saying his car was in the ditch and he was unable to get it out; and he soon left in a taxi. On Friday morning, February 19, a Cadillac was found in a ditch in the vicinity of the residence from which the taxi was called, the sheriff was notified, and the car was stored in Richmond. About 2 p. m. Sunday, February 21, a body was found in a roadside ditch approximately one and one-half miles from where the Cadillac was found. The identification papers on the body revealed that it was that of Luther Douglas Price and those who knew Luther Douglas Price also identified the body as that of Luther Douglas Price. Further investigation revealed that the appellant was driving the Cadillac in the vicinity of the store on the night the deceased disappeared. Also, it was determined that a friend of appellant's, R. W. (Porky) Johnson, had recently obtained a .22 caliber pistol. At this time a complaint was filed against the appellant charging him with the murder of Luther Douglas Price before Justice of the Peace Rucker. The next morning on a further search near the scene where the Cadillac had been in the ditch, a sack containing $13.75 was found.

After a newpaper story in Houston that appellant had been charged with murder, the appellant surrendered and was soon taken into custody by authority of an arrest warrant by Sheriff Gaston of Fort Bend County, who took him before Justice of the Peace Rucker where he was warned and advised of his rights. In a search for the pistol, the appellant told the officers that he threw it in the ditch between where he left the sack of money and the residence from which he called the taxi. At appellant's direction the pistol was found in the ditch, and when found the appellant told the officers at the scene that it was the pistol with which he shot Luther Douglas Price.

Dr. Bucklin examined the body of the deceased and testified that a gunshot wound in the head was the cause of death.

The appellant made and signed a written statement, which omitting the formal parts, reads in part as follows:

"My name is William Clark Bryan_ Jr. and I am 25 years of age. * * * I have been advised of my rights to counsel and I do hereby waive that right before making this statement. On Thursday, February 18, 1965, I was living with a friend of mine by the name of R. W. (Porky) Johnson at the above address. At about 6:30 P.M. on this date I went into the bedroom and I got a .22 Cal pistol that belonged to Porky and I checked it and it had 3 rounds of ammunition in it and I asked Porky if I could borrow his 1958 model Cadillac automobile and he told me that I could. When I got out to the car I looked into the turtle shell and I got some more .22 cal shells out of this compartment. I put 3 more rounds into the pistol and I put some loose shells in my pocket. I then got into the car and started driving around. I then went to a couple of beer joints and I drank some beer. I then drove over on Bissonnett to a couple of friends of mine by the name of Dave and Stanley. I don't know their last names. I tried to get Dave to call a girl friend of mine down at McMahons drug store but he wouldn't do it and he told me that I ought to leave her alone. While I was at Dave and Stanley's house I showed them this .22 cal pistol that I had. I left their house about 9:45 P.M. in this yellow cad. I then drove over to the U-Totem on 9530 Braeburn Glenn and I drove up in front of the store and parked the car. I went into the U-Totem store and I saw that there was no one in the store but this man that run the store and he was sweeping the floor. He was sweeping the floor around the check out counter and when I walked into the store I had my pistol in my hand and I walked up to him and I told him that this was a stick up and I want to change this, I just told this white man to give me the money and he walked to the cash register and opened it and he gave me the money and I told him

to lets go and he walked out to my car with me and I told him to drive and we got into the car and drove off. We drove out Bissonett and through the back roads to Richmond and then on to Rosenberg, Texas. This man told me that his name was Price and he told me that he was married and that he had four children and that his wife was going to pick him up at 11:00 P.M. and he was afraid that he would miss her. Mr. Price was driving the car and I was setting in the front seat with him and we were just talking about his family and I told him that I had a wife and two children. When we got to the underpass on the west side of Rosenberg I told him to turn around and I would take him back closer to Houston. He turned around and we went back through Rosenberg and Richmond and back toward Houston on Hwy 59. After we went through Sugarland I told this man to turn on a black top road which the Officers have told me the name of this road is the Elderidge Road. We went down this road until we Came to Bissonett and he turned right toward Houston and we went until we came to a gravel road and I told him to turn right and we came to the Belknap road and I told him to turn right again on another road which the officers told me was Stiles Lane and up this road about 150 feet and I told him to stop the car. It must have been about 11:15 or 11:30 P.M. and we were walking back down the road from the car and I was going to show him the way that I wanted him to walk. Mr. Price told me that he didn't want to walk down the road so I told him to go ahead and cross the ditch and walk across the field. He then told me that he didn't want to walk across the field. I then fired 4 shots to scare him and he told me to stop shooting and I asked him if he was hit and he said yes in his left side. He then walked back up out of the ditch up to me and I looked at his left side but I couldn't tell that I had hit him because it was dark. I asked him if it hurt and he told me no so I told him to go ahead and

walk across the field. Mr. Price turned around and then turned about half around again and drew up his arm and I thought that he was going to hit me so I shot him again. Mr. Price fell backwards and I saw that he was partly in the water in the ditch so I turned him over and he went all the way into the water. I didn't see where I had shot him but I knew that he was hit bad and I figured that he was dead so I ran and got into my car and turned it around and drov_ back past where Mr. Price was at and I went to the right until I got to Bissonnett and I turned left and drove until I came to a muddy gravel road and I was driving so fast that I lost control of the car and I went into the ditch and got stuck. I then got out of the car, and I had a paper sack with some silver in it that I had stolen from the U-Totem store laying in the seat and I took this sack and I got up on the road walking and I saw 2 or 3 houses on the opposite side of the road from where my car was stuck and I started walking down this gravel road. I walked quite a while and I decided to get rid of this sack of money that I was carrying so I walked over to the bank of the creek and I put the sack down on the ground. I then started walking on down the road and a little ways futher I decided to get rid of the pistol so I went down into the ditch and dug a hole in the water and burried the gun. I then walked on until I cam out on a black top road and I figured that this was Bissonnett and there was 2 or 3 houses across Bissonett so I turned toward Houston and walked up to one of these houses and rang the doorbell. A boy about 17 or 18 years old came to the door and I told him that I had car trouble and would like to call a cab and he let me in the house to use the telephone. I called the courteous cab. co. and I then left the house and walked on toward Houston until I met the cab. This cab driver carried me first to the Nomad Motel in the 10,000 block of South Main and I went in and registered under the name of J. L. Whitmore, That I was

working for the Gore Truck Line and lived in San Antonio, Texas. I had the cab wait for me because I wanted to know if the porter was working so I could get a beer and after I found out that he wasn't working I decided not to stay there and I got back into the cab and went over to the King Motel and checked in and spent the night. The next night I checked in at the Nomad Motel. On Monday, February 22, 1965 I saw in the newspaper that I was wanted for Murder so I czlled the Sheriff's Dep't. in Houston and talked to Lt. Joe Thorpe and told him where I was at and if he would come and get me I would surrender and he came and picked me up. Where I shot Mr. Price and killed him was in Fort Bend County Texas, I can read and write the English Language and I have read the above statement and it is true and correct to the best of my knowledge and belief."

The appellant did not testify before the jury. He called several witnesses whose testimony reveals much illness in his early childhood, with abnormal behavior beginning at age 11, followed by continuous acts of misconduct including numerous violations of the law, culminating in confinement in jail and also a term in the penitentiary, and several 90 day commitments in state hospitals. Several lay witnesses testified that he did not know right from wrong. The psychiatrist, Dr. Vogt, called by the appellant, testified that he was mentally ill and should be restrained, but stated that he had no opinion as to whether he knew right from wrong.

After a hearing was held in the absence of the jury on the voluntary nature of appellant's written statement, the trial court made independent findings that said statement was voluntarily made.

In the beginning of appellant's brief he states that:

"The Appellant's principal points in this appeal are that there was reversible error on the part of the trial court in allowing the Defendant's confession to be introduced in evidence, and in refusing to grant Defendant a new trial in view of newly discovered evidence as to Defendant's insanity, as to his being under the influence of alcohol and drugs, and as to information in the State's possession which casts substantial doubt as to the truth of the actions stated in the confession."

Appellant contends that the determination of the issue of the voluntariness of his confession by the trial court must be wholly independent of any consideration of its truth or falsity, and any procedural method which allows consideration of the probable truth or falsity of the confession in determining such issue is fundamentally unfair; and that the trial court never made a clear cut finding on the issue that he was mentally incapable of making a voluntary confession.

The trial court in his order overruling appellant's motion to exclude the written statement from the jury found that said statement was voluntarily made; that after his arrest he was immediately taken before a magistrate and advised that he was charged with murder; that he was advised of his right to counsel and was not denied counsel; that he was advised that he did not have to make any statement at all; that at the time he made the written statement to Officer Elder he was mentally alert and under no mental stress, and was in good physical condition.

In light of the allegations in the motion, the findings in the order overruling it sufficiently resolved the issues made on the hearing.

It is insisted that the court erred on the independent hearing on the issue of the voluntary nature of the confession in admitting and considering evidence of its truth or falsity.

When a hearing is held before the court and there is nothing to show that his findings were based upon inadmissible evidence, it will be presumed that the trial judge disregarded any inadmissible evi-

dence that may have been admitted, and the cause will not be reversed on appeal on the ground of the admission of inadmissible evidence if sufficient proper evidence was introduced to sustain the findings of the court. Tealer v. State, 163 Tex.Cr.R. 629, 296 S.W.2d 260; Skelton v. State, 165 Tex. Cr.R. 247, 306 S.W.2d 127; Garrett v. State, 307 S.W.2d 270.

Nothing appears in the record of the hearing which shows that the trial court considered any inadmissible evidence in making its findings.

Appellant contends that his written statement was not legally obtained on the grounds that he was not warned of his rights to refrain from making the statement, and that he was without counsel.

On the main trial the evidence of the state reveals that after a newspaper had published that appellant had been charged with murder he telephoned the sheriff's office in Houston about 1 p. m., gave his name, his location, and said he wanted to surrender, and he was soon taken into custody. About 1:30 p. m., the appellant was delivered to Sheriff Gaston and Deputy Sheriff Elder of Fort Bend County, and they took him immediately before Justice of the Peace Rucker in Sugarland, arriving at 3:10 p. m., where the murder charge against him was pending. Justice Rucker first read the complaint to the appellant, advised him of his right to counsel, and that if he had no counsel he would appoint counsel for him; that he could have an examining trial or he could waive it; and further told him he did not have to make any statement and any statement he did make could be used against him. The appellant said he did not want an attorney, and then made no statement to Rucker about the facts of the case, and a commitment was issued. After appellant was placed in jail the sheriff and Deputy Elder both advised him that he did not have to talk with newsmen unless he desired, and he willingly agreed and talked with them from 4:20 to 5:10 p. m. After the officers talked

with the appellant, he accompanied them at 5:15 p. m. on a search for a pistol but night came and the search was discontinued. Then they went to the Nomad Motel in Houston where the clerk identified the appellant as the man who arrived alone at the motel in a cab on the night of February 18. After returning to the Richmond jail at 9 p. m., the officers talked with the boys from whose residence the appellant had called a taxi and then talked with the taxi driver. Next, the appellant made a written statement to Deputy Sheriff Elder. Before beginning the statement Elder advised the appellant of his right to counsel and he said he did not want an attorney. Elder then warned the appellant in accordance with the provisions of Art. 727 C.C.P. which was in effect at the time. He made a statement to Elder in the presence of Deputy Sheriffs Irby and Cleboski which the appellant read and signed. Elder began typing the statement at 11:25 p. m. and completed it at 12:03 a. m., Tuesday. Accompanied by the appellant, the officers left the jail about 7:30 a. m., Tuesday, to search the scene for the pistol which the appellant said he threw between where he left the money sack and the house where he telephoned for a taxi. After finding a pistol in the ditch and before it was moved, Officer Elder asked the appellant, "Is that the gun and he said yes, that is the gun that I shot Mr. Price (deceased) with." The pistol, when found, contained four spent shells and two live shells. Deceased's body was found between three and four miles from the store.

Dr. Bucklin testified that he performed an autopsy on the body of the deceased; that his examination revealed a gunshot wound among others, above the right ear; that he recovered a small caliber bullet; and he expressed the opinion that the gunshot wound of the head was the cause of death.

The evidence reveals that the appellant's fingerprints were found on the steering wheel of the Cadillac found in the ditch

and which the officers took into their possession.

The appellant did not testify before the jury on the main trial.

█ The evidence was sufficient to warrant the conclusion that the written statement was legally obtained and authorized its admission in evidence.

Appellant strenuously insists that the trial court erred in overruling his amended motion for a new trial on the ground of newly discovered evidence as to his insanity and that he was under the influence of alcohol and drugs at the time of the killing, and as to information in the state's possession which casts doubt as to the truth of the actions stated in the confession.

In support of his amended motion for new trial, the appellant called John Gresham, one of the attorneys appointed for him March 15, before the trial on November 15, 1965. He testified that they never discovered anything about appellant's use of barbiturates during the original investigation. There was some indication of his drinking alcohol, but no information that appellant was under the influence of either or both at the time of the killing; that such information was first learned from appellant about the diagnosis of chronic brain syndrome resulting from barbiturates and alcohol; and that they had relied on the report of Dr. Dwyer. Further, that he did not remember noticing in the officers' reports during his examination of the state's file that there was blood on the front and back seat of the Cadillac; that no significance was given to certain diagnosis in the report of Dr. Dwyer made three days after date of confession; that appellant did not cooperate and it was difficult to communicate with him and they had to rely primarily on his family and others, and learned nothing about his use of drugs.

On cross-examination Gresham stated that the motion for continuance on May 19 stated that the defense was insanity; that he talked to the appellant, his wife, and mother numerous times before November 15, the trial date; that they learned of Dr. Crow's examination of appellant in May 1965, saw Dr. Dwyer's report and consulted with Dr. Vogt; that he was shown the state's file and told of everything the district attorney had concerning the case, and Deputy Sheriff Elder cooperated with him; that they were shown statements of witnesses for cross-examination purposes; that they were aware that upon request the court would appoint a psychiatrist to examine appellant but they decided not to make the request; and that they had read the state's psychiatrist reports.

The appellant also introduced on the motion the affidavits of Dr. Tracktir, Ph.D., Clinical Psychologist, Dr. Crow, M.D., Lillian Bibbs, Mrs. Carol Bryan, Charles Rainwater, and the appellant.

Bibbs and Rainwater testified on the main trial. Mrs. Carol Bryan, wife of the appellant, was present at least two days during the trial according to testimony on the motion. Gresham testified that he knew that Dr. Crow, a psychiatrist, had made several examinations of the appellant. Dr. Tracktir's affidavit reveals that he administered psychological tests to the appellant; and that "Tests of intellectual ability yield a score of 105 indicating average intelligence. This functional level, however, is quite inconsistent." He did not express any opinion as to his insanity.

The state controverted appellant's amended motion for a new trial and offered evidence in rebuttal.

Deputy Sheriff Elder testified that he made and kept a file of all the memoranda and reports in the instant case; that he turned the file over to attorneys for the appellant three or four times, never withheld any information from them, and took them to the scene and showed them where the body, the gun, and the money were found, and where the Rainwater boys lived (appellant called the taxi from their house and Charles Rainwater testified on the trial). He further testified that on Sun-

day after the alleged killing on Thursday night he found blood stains in the car, one spot about the size of a quarter and another smaller spot on the rear seat and one quarter-size spot on the front seat; that the blood spots were dried and old, and from his investigation they did not have any significance to the case; and that the file he turned over to the attorneys contained the offense report relating to the finding of the blood in the car.

District Attorney Bassett testified that he showed the attorneys for the appellant everything he had in his files and advised Deputy Sheriff Elder to do the same thing; that he first advised one of the attorneys for appellant in May, 1965, that upon request the judge would appoint a psychiatrist for the appellant.

■ The amended motion and the evidence in support of it have been considered in light of the rule that where the defense is insanity, the requirement of diligence in the discovery of newly discovered evidence is not as strict as in other instances; and further, that in order to entitle an accused to a new trial, the newly discovered evidence must be such as would likely change the result, if produced on another trial. 1 Branch (2) 252–256, Secs. 220–223.

■ The decision on a motion for a new trial rests in the sound discretion of the trial court and in the absence of an abuse of discretion its decision will not be disturbed on appeal. Grizzell v. State, 164 Tex.Cr.R. 362, 298 S.W.2d 816.

■ It is concluded that the trial court did not abuse its discretion in overruling appellant's amended motion for new trial.

The issue of the voluntary nature of appellant's written statement was submitted to the jury; and the court further charged the jury that if appellant was not advised of his right to counsel and if he did not waive counsel, or if they had a reasonable doubt thereof to disregard the statement and not consider it for any purpose.

The law applicable to insanity and the issues pertaining thereto were submitted to the jury.

There were no objections to the court's charge, and no requested charges were presented.

■ The evidence is sufficient to support the conviction.

The judgment is affirmed.

Opinion approved by the Court.

### CONCURRING OPINION

MORRISON, Judge.

Though I concur in the affirmance of this conviction, I heartily disagree with the reasoning of my Brethren in that portion of the opinion in which they discuss the rule of evidence relating to the truthfulness of the confession heard by the trial court.

An examination of the record reveals an important distinction between this case and Acosta v. State, Tex.Cr.App., 403 S.W.2d 434 (this day decided). In the instant case the prosecutor made legitimate inquiries into appellant's conversation with the officer to whom he made the statement without digressing into the truth or falsity thereof. The prosecutor stated in answer to an objection, "I am not going into the crime itself." The only question remotely connoting an inquiry into the truthfulness of the confession was the last question, "You did know that you threw the change away," to which there was no objection.

This to me distinguishes the two cases.