Anthony Charles **WILLIAMS**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 67147.

Court of Criminal Appeals of Texas, En Banc.

Oct. 14, 1981.

Will Gray, court appointed on appeal only, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., George McCall Secrest, Jr., and Robert A. Moen, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

OPINION

ROBERTS, Judge.

The appellant was found guilty of capital murder; the jury answered affirmatively special issues (1) and (2), Article 37.071(b) V.A.C.C.P., and accordingly the punishment

was assessed at death. The sufficiency of the evidence at either the guilt or punishment phase of the trial is not challenged.

By his first ground of error the appellant contends that the trial court committed reversible error in excusing for cause Venire Members Tillman, Criner, Anderson and Oligney. He contends that these prospective jurors were excused in violation of the Sixth and Fourteenth Amendments as construed in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In examining the Texas procedure for selecting jurors in capital cases the Supreme Court of the United States recently stated:

"[T]he general proposition [is] that a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

" ... If the juror is to obey his oath and follow the law of Texas, he must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to answer the statutory questions without conscious distortion or bias. The State does not violate the *Witherspoon* doctrine when it excludes prospective jurors who are unable or unwilling to address the penalty questions with this degree of impartiality." *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980).

Based on the record before us, we conclude that the aforementioned venire members were unable or unwilling to consider the statutory special issues with the degree of impartiality to which the State was entitled.

Venire Member Tillman gave conflicting responses when asked whether under any circumstances he could answer the special punishment issues affirmatively. Although he initially stated that he could answer "Yes" if the issues were proved by the evidence, Tillman later stated that his religious beliefs would prevent him from answering the punishment questions. At the conclusion of his voir dire examination Tillman agreed that he would automatically respond "No" to one of the issues to prevent the appellant from receiving the death penalty even though the evidence was to the contrary.

Venire Member Criner informed the trial court that she did not believe in capital punishment. Criner further stated that no matter what the evidence might show she believed that she would vote "No" on at least one special issue to prevent the imposition of the death penalty. Criner expressed the belief that she could not answer both issues "Yes" no matter "how horrible the circumstances."

Venire Member Anderson stated that her conscience would not permit her "under any circumstances" to answer both issues "Yes." Anderson agreed that she would automatically vote "No" simply because she did not believe in the death penalty.

Venire Member Oligney also gave conflicting answers when asked whether she could answer the punishment issues affirmatively. Oligney initially stated that she "imagine[d]" that she could vote "Yes" to both issues, but she was not certain. Oligney subsequently concluded that she would probably answer "No" to at least one of the special issues "in spite of the evidence" because she did not believe in capital punishment.

■ The record adequately demonstrates that these venire members' views about capital punishment would have prevented or substantially impaired the performance of their duties as jurors in accordance with their instructions. Thus we conclude that the trial court did not err in excusing them for cause. The appellant's first ground of error is overruled.

■ By his second ground the appellant contends that the trial court committed reversible error in denying his challenge for cause to the twelfth juror selected, Alva Jean Wagner. Specifically the appellant

asserts that the voir dire examination revealed that Wagner was not qualified to sit on the jury because: (1) she would be inclined in a case involving an "atrocious" murder to find the accused guilty of capital murder even though the evidence failed to establish the alleged aggravating circumstances, and (2) she would not consider life imprisonment for a defendant found guilty of capital murder.* We conclude that the appellant's contentions are without merit. Wagner specifically stated that although she "might have a tendency to want to do so" she would not convict an accused of capital murder simply because of the horror of the case. Wagner also stated that even though she "may not like it" she would follow the law and not convict an accused of capital murder unless the alleged aggravating circumstances had been proven. It does not appear from the record that Wagner was unable or unwilling to follow the law in determining whether the appellant was guilty of the offense of capital murder.

As to the claim that Wagner could not consider the full range of punishment, Wagner did admit that it probably would be her "tendency to assess the highest punishment" if the defendant was found "guilty of the highest crime at the guilt or innocence stage" of the trial. But Wagner never stated that she was incapable of considering life imprisonment as adequate punishment for a defendant guilty of capital murder. In fact Wagner informed the trial court that she would not answer the statutory issues "Yes" contrary to the evidence simply because she believed that death was the appropriate penalty. The voir dire examination of Wagner does not show that she would consider only the death penalty. The appellant's second ground of error is overruled.

By his third ground the appellant contends that he "was denied a fair determination of the voluntariness of his written confession where the trial judge informed each prospective juror that a confession is inad-

missible only if it is obtained by 'torture.' " The trial court gave the first juror selected the following explanation of the law relating to the admissibility of confessions:

"Q All right. Let me go to the next problem that might arise. I don't know whether there is to be a confession in this case. There have been questions asked that indicate to me there may be, but again we're not talking about this case. I want to talk to you now about just any other case. Our law says that before a confession can be used by a jury to convict a defendant, that they must consider whether or not the confession was voluntarily given. In other words, if you believe that the confession was tortured out of somebody, you're not to consider the confession because understand tortured people may say or do anything. And even if you believe that it was true, but you believe that it was tortured, you're not to consider it. Could you set aside the confession and consider it for no purpose even though you believe it's true, if you thought it was coerced or forced out of a person?"

A similar explanation was given to the other eleven venire members selected to serve upon the jury.

 No objection was made to the trial court's comments and thus nothing is presented for review. *Woods v. State,* 569 S.W.2d 901 (Tex.Cr.App.1978). Further, the court's remarks to the jury were rendered harmless. Our review of the record reveals that there was no evidence before the jury raising the issue of voluntariness; the appellant did not testify or call any witnesses on the issue. At worst the trial court's statements merely misled the jury as to the appropriate standard for determining whether a confession was given voluntarily. Since that issue was not before the jury, no harm resulted.

---

* On appeal the appellant also contends that Wagner was not qualified because she could not probate a sentence where the accused had been convicted of murder. No objection on this ground was raised at trial; nothing is presented for review.

In the same ground of error, the appellant asserts that the "failure of [his] court-appointed counsel to object to this prejudicial instruction by the trial court deprived him of the effective assistance of counsel." The Constitution demands only reasonably effective counsel, not counsel that is error-free. The representation in this case was well within that standard. Further, counsel's failure to object to the court's remarks was harmless in light of the fact that the issue of voluntariness was not raised by the evidence. The appellant's third ground of error is overruled.

By his fourth ground the appellant contends that Article 37.071 V.A.C.C.P. violates the Sixth, Eighth, and Fourteenth Amendments "because it contains no provisions for directing and instructing the jury's consideration of mitigating circumstances at the punishment phase of the trial." It is the appellant's contention that a "charge on all mitigating evidence at the punishment phase of a capital murder trial is imperative if the jury is to give meaningful consideration to such evidence." The appellant has failed to preserve the error now asserted on appeal. No objection to the court's charge or special requested instruction was filed. Articles 36.14 & 36.15 V.A.C.C.P. Absent such an objection or requested instruction, the trial court's failure to charge the jury as to the consideration of mitigating circumstances was not reversible error. The appellant's ground of error is overruled.

By his final ground the appellant contends that evidence of unadjudicated, extraneous rape offenses admitted at the punishment phase of the trial "rendered the proceedings fundamentally unfair and deprived [him] of due process and equal protection of the law." This Court has previously held that, absent a showing of unfair surprise, proof of unadjudicated, extraneous offenses at the "sentencing proceeding" of a capital case is admissible. *Garcia v. State*, 581 S.W.2d 168 (Tex.Cr.App.1979). The appellant does not contend that he was unfairly surprised by the evidence now com-

plained of on appeal. The appellant's ground of error is overruled.

The judgment is affirmed.

TEAGUE, Judge, dissenting.

After reading and examining with close scrutiny the entire voir dire examination of prospective jurors Tillman and Oligney,[1] I have concluded that these two persons were not properly disqualified from serving as jurors in this capital murder case. This conclusion is buttressed by the Supreme Court's decisions of *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), and *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), as well as the Fifth Circuit's decisions of *Burns v. Estelle*, 626 F.2d 396 (1980); 592 F.2d 1297 (1979). See also Art. 37.071, V.A.C.C.P. Tillman and Oligney were improperly challenged for cause by the State's prosecutor, and were improperly excused by the trial judge.

In *Adams*, supra, the Supreme Court used the "totality of the circumstances" test based upon the *entire voir dire* examination of the challenged prospective jurors and rejected the exclusion of otherwise qualified jurors predicated upon isolated responses elicited in answer to leading and suggestive questions by the trial judge and the prosecutor.

Here, the trial court did not make any specific findings that the prospective jurors were being excluded for cause under *Witherspoon* independently of or in conjunction with V.T.C.A. Penal Code, Sec. 12.31(b).

The exclusion of Mr. Tillman and Mrs. Oligney was based upon responses closely analogous to those condemned by the Supreme Court in *Maxwell v. Bishop*, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970); *Segura v. Patterson*, 403 U.S. 946, 91 S.Ct. 2280, 29 L.Ed.2d 856 (1971); *Funicello v. New Jersey*, 403 U.S. 948, 91 S.Ct. 2278, 29 L.Ed.2d 859 (1971); *Harris v. Texas*, 457 S.W.2d 903 (Tex.Cr.App.1970), cert. denied 403 U.S. 947, 91 S.Ct. 2291, 29 L.Ed.2d 859

---

1. See also the Appendix attached to this opinion.

(1971). *Adams* clearly reiterated and emphasized the key *Witherspoon* phrases such as "unmistakably clear" (391 U.S. at 522, n. 21, 88 S.Ct. at 1777, n. 21) and "unambiguously" (id. at 516, n. 9, 88 S.Ct. at 1774, n. 9) as the minimum constitutional standards applicable to the responses of prospective jurors excused for cause on the capital punishment issue.

The majority's simplistic approach to uphold the State's challenges for cause of Tillman and Oligney actually flies in the face of the mechanistic formulae this Court has in the past condemned.

On September 23, 1981, a majority of this Court adhered to the following comment:

Addressing problems associated with an 'equivocating venireman' in *Tezeno v. State*, 484 S.W.2d 374, [Tex.Cr.App.] we stated:

We cannot believe that *Witherspoon v. Illinois*, supra, requires certain formal answers and none other. We surely feel that the test of *Witherspoon* is 'not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. (*Vanderbilt v. State*, [Tex.Cr.App.] No. 66,710, September 23, 1981).

Today, we truly adopt a "hypertechnical and archaic approach" when Tillman and Oligney are held to be properly challenged for cause by the prosecution and excused by the trial court. It is easily seen by the majority's opinion that the differences between the "equivocating juror" and the "vascillating juror" are not recognized by the majority and, for this reason, if no other, it errs.

The voir dire examination of the prospective jurors in this cause conformed to the following procedure: the trial judge first covered general considerations of the trial and of the voir dire, then he examined the venire members individually;[2] this was followed by voir dire examination first by the State's attorney, then by defense counsel. Prior to this, the trial court had admonished the venire as a whole that "I would like for you to give [the death penalty] some thought prior to the time of you coming in here, so *you* can get it resolved as best *you* can. It's not an easy question to a lot of people." (Emphasis added.)

Tillman and Oligney were "vacillating jurors." A "vacillating juror" is a venire member who first takes one position, then switches to the other, as to whether or not he or she can answer the special issue questions "yes," see Art. 37.071, V.A.C.C.P., even though he or she knows that such answers will result in the death penalty being imposed. An "equivocating" juror is a venire member who fails to take a firm position on the issue, answering, for example, "I think," or "I'm not sure." He or she is truly the "fence straddling juror."

The majority apparently believes that in instances of vacillation a prospective juror's final answer on the issue is controlling. However, I don't believe that is a proper test to disqualify a prospective juror under *Adams* and *Witherspoon*—merely because that juror answers a "magic question" correctly, at least not where that same juror has also stated just the opposite in response to previous questioning.

In this situation, I believe a venire member must *repudiate* any earlier, conflicting responses which would otherwise qualify that person under *Witherspoon* or *Adams*. Otherwise, the juror may simply be confused as to the meaning of the question. Since this type of confusion is frequently the cause of the venire member's vacillation, as I believe was the case in this cause, *absolute repudiation* of the juror's prior answers is necessary before that prospective juror can be successfully challenged for cause by the prosecution.

Although it may be true that where the trial court is confronted only with an "equivocating juror," "elements such as demeanor and tone of voice, etc., are important factors in conveying the precise message intended," see *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App.1976), cert. denied,

---

2. Cf. Art. 35.17(2), V.A.C.C.P.

431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977); *Granviel v. Estelle*, 655 F.2d 673 (5th Cir. 1981), aff'd in part, rev'd in part; *White v. State*, 543 S.W.2d 104 (Tex.Cr.App. 1976); *Tezeno v. State*, supra, a "vacillating juror" has demonstrated an opposite intent, not merely an uncertainty, thus precluding a determination based on such factors and on what happens to be the venire member's last answer.

In order to disqualify a prospective juror under *Witherspoon-Adams*, I believe that person must give unequivocal and absolute answers, *repudiating* all prior contrary answers. The State must "show that because of the prospective juror's feelings against the death penalty he would be unable to answer the special issues without engaging in a 'conscious distortion' of the facts or law. When a juror engages in such conscious distortion, he ignores his instructions concerning the special issues, and violates his oath to render a true verdict according to the law and evidence." *Pierson v. State*, 614 S.W.2d 102 (Tex.Cr.App.1980). When a venire member states unequivocally that he can vote "yes" to the special issues, then later states that he cannot, but *does not* specifically and absolutely *repudiate* his previous affirmative statements, the State has not unambiguously shown that the venire member would engage in a "conscious distortion" of the facts or law. Unlike the "equivocating juror" situation, the State must get a specific and absolute *repudiation* from a "vacillating juror" of his previous conflicting statements in order to meet this burden.

Again, this occurs only when the prospective juror has given unequivocal statements that he or she could answer the special issues "yes." This clearly occurred here when Ms. Oligney stated that "if [she was] satisfied in [her] mind that the answers should in fact be "Yes," then [she] would follow the law and answer them "Yes," knowing what [her] answers would direct the Judge to do," and where Tillman answered "Yes" to the trial judge's question, "Can you answer [the special issues] 'Yes' if the evidence is there, knowing it would cause death to the Defendant, whoever the defendant might be?"

As I view the record, these prospective jurors have not finally stated absolutely and unequivocally that they would automatically, blindly, vote "No" to one of the special issues to avoid imposition of the death penalty, as I believe must be shown to disqualify a juror under the *Witherspoon-Adams* test.

Only the most extreme and compelling prejudice against the death penalty, perhaps only or very nearly a resolve to vote against it blindly and in all circumstances, is cause to exclude a juror on *Witherspoon* grounds. A mere disbelief in it, or even 'conscientious or religious scruples, against its infliction will not suffice, since many people hold such views and some of these may yet be able to overcome them and abide by the law. (J. Gee in *Burns v. Estelle*, 592 F.2d 1297, 1300 (5th Cir. 1979).

It is quite obvious to me that Tillman and Oligney did not, from a "totality of the circumstances," give unequivocal and absolute answers sufficient to render them disqualified from serving as jurors in this capital murder case. Although this Court has opted for the rule that *Witherspoon*, supra, does not require certain formalistic answers from a prospective juror, to render that person disqualified, nevertheless, due to our unique procedure in prosecuting a capital murder cause, nothing less is demanded from an "equivocating" or "vacillating" juror. However, as noted, there is a difference between an "equivocating juror," a "vacillating juror," and a "confused juror," which I believe these persons were. My reading of the record does not show that they were adequately and sufficiently informed about our Texas death penalty procedure to render them to be totally disqualified from serving, at least not by the answers they gave. It is quite obvious to me that, from a "totality" of each voir dire examination, these persons intermixed their feelings towards the death penalty with their legal obligation to answer certain special issues. When this occurred, further and more de-

tailed voir dire examination, than here, was mandated. Otherwise, we are back to the old days of pre-*Witherspoon*. By today's decision any person who is labeled "an equivocating juror" cannot now serve on a capital murder jury in Texas. Regardless of one's beliefs towards the death penalty, if that person can honestly and truthfully answer the special issues submitted at the punishment hearing, see Art. 37.071, V.A.C. C.P., such person, as I view the above cases from the Supreme Court and the Fifth Circuit, is not disqualified from serving as a juror. Cf. *O'Bryan v. State*, 591 S.W.2d 464, 471 (Tex.Cr.App.1979).

To me, in light of *Adams*, supra, and see also *Burns*, supra, when a prospective juror says that he or she would be "affected" by their answers to the questions, this automatically triggers a necessity for the trial court to make further and more detailed inquiry into the jurors' concerns. As to what questions such person might be asked, in order for the "cold" record to reflect unequivocally and absolutely that that person has manifested the most extreme and compelling prejudice against the death penalty, to possibly the extent that he would answer the questions blindly and in the negative, this, of course, is within the purview of the trial court. See, however, *Burns*, supra, 592 F.2d at page 1301.

If individuals are to be prosecuted, convicted and assessed the death penalty in this State then, at the very minimum, those persons should have their causes judged by a jury of 12 persons who have been selected fairly and impartially by law as well as by the procedure mandated by the Legislature of this State. To ignore the obvious is not the same as to leap-frog the impossible, but simply to meet same head-on—which is all I am asking for by my dissent. Cf. *White v. State*, 543 S.W.2d 104 (1976).

The procedure and reason given for excusing Tillman and Oligney are reminiscent, if not a repeat, of pre-*Witherspoon* days in Texas. See *Crain v. State*, 485 S.W.2d 286 (Tex.Cr.App.); *Quintana v. State*, 485 S.W.2d 281 (Tex.Cr.App.); *Whan v. State*, 485 S.W.2d 275 (Tex.Cr.App.); *Harris v.

State*, 485 S.W.2d 284 (Tex.Cr.App.); *Turner v. State*, 485 S.W.2d 282 (Tex.Cr.App.); and *Cherry v. State*, 488 S.W.2d 744 (Tex. Cr.App.); *Enriquez v. State*, 429 S.W.2d 141; *Ellison v. State*, 419 S.W.2d 849 (Tex. Cr.App.); *Pittman v. State*, 434 S.W.2d 352 (Tex.Cr.App.); *Scott v. State*, 434 S.W.2d 678 (Tex.Cr.App.); and *Bryan v. State*, 406 S.W.2d 210 (Tex.Cr.App.) for examples.

To have a meaningful voir dire examination of a prospective juror, and to see by a cold naked record whether a prospective juror is disqualified, I submit the following meaningful *minimum* procedural outline which I believe is what our Legislature mandated when it enacted our death penalty statute. And which, by their decisions, the Supreme Court and the Fifth Circuit require.

1. The prospective juror is advised what the charge is.

2. The prospective juror is advised that he or she will first be called upon to decide the guilt or innocence of the accused, as to the main charge as well as any possible lesser included offenses;

3. The prospective juror is then advised that if he or she believes that the guilt of the defendant has been established, beyond a reasonable doubt, of the main charge, that is capital murder, then he or she is advised there will be a punishment hearing.

4. The prospective juror is then advised that if the defendant is found guilty of capital murder, then only two possible punishments will be applicable, death or imprisonment for life.

5. The juror should then be questioned as to whether this would affect his or her deliberations of any issue of fact that may be raised; be it at the guilt-innocence stage or at the punishment stage.

6. If the prospective juror satisfies Art. 12.31, Penal, and replies that the mandatory penalty of death or imprisonment for life will not affect his or her deliberations on any issue of fact, then the trial court goes next to number 7 infra.

7. The prospective juror is then told that under the law, if the defendant is found guilty of capital murder, there will be a punishment hearing, after which the trial court will give the jury certain questions to answer; the punishment to be assessed by the court depending on how the jury answers the questions.

8. The prospective juror is told the questions and, after ascertaining that the juror understands the questions and how the questions are to be answered; i. e., from the evidence presented by the State, beyond a reasonable doubt, then the prospective juror should then be asked again whether the mandatory penalty of death or imprisonment for life would affect his or her deliberations on the issues of fact to be submitted to the jury at the conclusion of the punishment hearing.[3]

Only until the cold naked record shows affirmatively and unequivocally that a prospective juror cannot serve because of the juror's beliefs against the death penalty, should a challenge for cause be sustained. In sum, it is the responsibility and duty of the trial court, not the prosecutor nor the defense attorney,[4] to ascertain from the juror and show on the cold naked record that the juror has the most extreme and compelling prejudice against the death penalty, such that knowing that if he finds the defendant guilty of capital murder, one of the possible punishments may be death and this will affect him in his deliberations on the guilt or innocence of the accused to such an extent that he will blindly resolve the issue in such fashion that he will violate his oath of office as a juror if selected. Furthermore, it must be clearly shown on the record that this blind prejudice against the death penalty carried over to the punishment stage of the trial—to such a degree that the prospective juror cannot, because of his extreme and compelling prejudice against the death penalty, answer the questions that will be submitted pursuant to Art. 37.071, V.A.C.C.P. Less than this will not do to comply with *Witherspoon-Adams*, or *Burns v. Estelle*. The excusing of Tillman and Oligney fell below the minimum standard of due process and due course of law.

To continue on the treadmill of procedure a majority of this Court has adopted is, in my humble view, not to solicit the Brethren in Washington or the Brethren in New Orleans or the Brethren who sit as Federal District Judges to tell us what is wrong with our procedure, but to quite frankly beg those Brethren to show us the guiding light of what is the correct procedure. And I predict that in the near future they will do so—to this Court's majority's chagrin, I might add.

The death penalty may not be imposed if even one prospective juror has been excluded in violation of *Witherspoon*. *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976).

Accordingly, the cause should be reversed and remanded for a new trial, and not affirmed.

I respectfully dissent.

---

**3.** It should be apparent and obvious to the reader that, contrary to the records and cases before this Court in the past, and pending before this Court at this time, my interpretation of post-*Witherspoon* and *Adams'* cases leads me to the conclusion that surface-wise, one's beliefs in the death penalty are irrelevant to whether one may serve as a juror in a capital murder case. I feel that this Court went astray a long time ago, see *Brock v. State*, 556 S.W.2d 309 (Tex.Cr.App.1977); cert. denied, *Brock v. Texas*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977), when it refused to declare Art. 35.16(b)(1), V.A.C.C.P., null and void as being unconstitutional. Even at this late date, by failure to make that declaration, a prospective juror in Texas who has conscientious scruples in regard to the infliction of the punishment of death for crime, in a capital case, where the State is seeking the death penalty, is still subject to a challenge for cause by the State. Until this statute is declared unconstitutional as being violative of *Witherspoon*, I fear that the Brethren in Washington and New Orleans will continue to set aside death penalty convictions from Texas, for the improper exclusion of prospective jurors.

**4.** Cf. *Ortega v. State*, 462 S.W.2d 296, 303–304 (Tex.Cr.App.1970).

## APPENDIX

The relevant testimony of prospective juror Tillman is as follows:

Q (By the court): What is your feeling concerning capital punishment?

A: I don't believe in it.

Q: Do you have conscientious scruples that would prohibit you from ever participating, along with 11 other jurors, in returning a verdict which would ultimately cause the death of the Defendant?

A: I do.

Q: Are you telling me then that the mandatory penalty of death or imprisonment for life will affect or will not affect your deliberation on any fact issue? Do you understand what I'm saying?

A: Not exactly.

Q: The law says that a prospective juror must be able to find—say whether he would or wouldn't; in this case, the fact that life or death would be the only possible two punishments. You follow what I'm saying?

A: Yes.

Q. If those were the only possible punishments, and knowing that that was the range of punishment, would that affect your deliberations on any particular point so as not to arrive at a verdict of death?

A: No, sir.

Q: It would not affect it?

A: No, sir.

Q: It would not affect it?

A: Not affect it.

Q: You would then be able to look at the facts, and knowing that if you answered the two questions "yes", it would result in death, you still could answer the questions "Yes"?

A: I don't think so.

(The court then had Tillman read the two special questions, and Tillman indicated that he understood them.)

Q: Now, if proof was offered to convince you beyond a reasonable doubt that the response to those two questions should be "Yes", but you further understood that in the event you answered those "Yes," that I would be required to assess a punishment of death, could you answer them "Yes"?

A: Yes.

Q: Do you fully understand what I'm saying?

A: (Nodding affirmatively.)

Q: You're opposed to capital punishment, right?

A: Yes.

Q: There are some people who say, "Okay, that's not my responsibility. I believe that if the evidence shows it, I can answer 'Yes', even knowing that the answer to 'Yes' to both of those questions would cause the defendant to die.

A: (Nodding affirmatively.)

Q: Now, think about this a minute and tell me what your feelings are for sure.

A: Well, I believe confidently that if the facts proved it, I would say yes.

Q: Even though realizing that the result would be death?

A: Yes.

. . . . .

(The court then addressed other issues to be presented in the trial.)

A (By the prosecutor): Reverend Tillman, how long have you had your feelings about the death penalty? How long have you felt that way?

A: Ever since I knew about it.

. . . . .

Q: How did you arrive at your decision about the death penalty?

A: I arrived at my decision from the Scriptures.

. . . . .

Q: Do you feel like, feeling the way you do about the death penalty, that you would be able to participate in a trial like this . . . I think you realize that Mr. Mosley and myself will be seeking the punishment of death in this case, actively seeking that punishment. And we will be asking the jury, based on all the evidence, if they find the Defendant guilty in this case, to return

"Yes" answers to both of those questions which would in effect make the Judge then impose the sentence of death to this Defendant. Do you feel like you would be able to participate in such a trial based on the feelings that you have about the death penalty?

A: Well, I don't feel like I can.

Q: . . . Do you feel like, regardless of what the facts or circumstances might reveal in this case, that you would be unable to participate in this trial because of the possible punishment that the State would be asking for or the possible punishment you might be called upon to administer or at least participate in?

A: That is correct.

Q: Okay. And would your feeling be the same regardless of what the facts might show, regardless of what the evidence might reveal to you in spite of how horrible the case or the killing might be; you feel like nonetheless that wouldn't sway you from your belief that you have?

A: No, sir, I don't believe.

. . . . .

(The prosecutor then explained the special issue procedure again.)

A: Do you feel like you would be able to answer these questions "Yes" based on the evidence, having the evidence that you have about the death penalty, or do you feel like your answers might be affected because of—or would be affected because of your religious beliefs?

. . . . .

(Tillman appeared to not understand the question, and the prosecutor explained the special procedure again.)

Q: Do you feel like you would be able to participate in such a proceeding and be able to answer those questions "Yes," knowing that by doing that the Judge would have to sentence the Defendant to death? And the only reason I ask you that is because of what you told me your religious beliefs are.

. . . . .

(Defense objection sustained, to add "assuming the facts proved that the an-swers should be 'yes,' could he and would he vote 'yes' if the evidence was there.")

Q: You understand what I was talking to you about, Mr. Tillman?

A: I believe I do.

Q: Do you think that if you were called upon from the evidence—in other words, the evidence proved to you that your answers should be "Yes," do you feel like you can answer those questions "Yes," knowing that if you did and all the rest of the jurors answered "Yes," that it would have the effect of making the Judge sentence the Defendant to the punishment of death? Do you think you could do that or do you feel like your religious beliefs would keep you from being able to do that?

A: I believe my religious belief would keep me from giving answers, yes.

A: . . . Do you think that you might answer one of those questions "No" even if you felt like from the evidence the answer should be "Yes"? Do you think you might answer the question "No" just to make sure the Defendant did not receive the punishment of death, if you were on a jury such as this because of your religious beliefs?

A: Well, yes sir.

Q: . . . Can you think of any set of circumstances where your mind would be changed from the way that you feel now? Can you think of any set of facts that would change your mind?

A: Truly, Lawyer, I don't think there is any now.

. . . . .

(Challenge for cause was not made, and defense counsel asked to pose a few questions.)

Q (By defense counsel): . . . Let's assume that you were sitting on a jury. You know there would be 11 other folks with you?

A: Yes, sir, I do.

Q: And that the evidence was overwhelming—not in this case, but in a make-believe case, that a defendant committed the offense of capital murder. So you and

the 11 jurors go out, and you decide, yes, the evidence is there, and you convict him. Then you come back in and the Judge asks you to answer these two questions. He doesn't ask the jury to actually sentence the man to death. He asks the jury to answer these two questions yes or no. No. 1 is [special issue is quoted]. If the evidence is already there, you've already found him guilty of capital murder. Could you and would you answer that question "Yes," if it was the law and it was the evidence with 11 other people; could you answer it "Yes"?

A: No.

Q: In other words, regardless of what the evidence showed, you would answer it "No" even though the evidence was overwhelming; is that what you're telling me, Reverend?

A: Well, I understand. The question in my mind—I may be wrong, but the question is in my mind whether or not it is life imprisonment or death.

. . . . .

(Question made and objected to.)

Q: What I was getting at, Reverend Tillman, is before the jury could answer "Yes," all 12 people have to agree. You see what I mean?

A: Yes, sir.

Q: But, my question to you is, if the evidence was there to satisfy you that the answer should be "Yes," could you and would you answer "Yes," knowing that it was the law and that the evidence was present to justify that answer?

A: Yes.

Q: ... Even though you're basically against the death penalty, if you were seated on a jury, could you follow the law, and if the evidence justified "Yes" answers to both of those questions, could you and would you answer those questions "Yes," knowing that the two "Yes" answers were going to mean that the Judge would assess the death penalty? Could you and would you do that?

A: No.

Q: Regardless of what the evidence showed, you're going to answer one of them "No" so that the man won't get the death penalty; is that what you're telling us?

A: I'm not saying that.

Q: Go ahead, if you can, explain your answer for me.

A: Well, my answer in my mind is this: I would rather not have anything to do with a thing that I know will cause death or capital punishment.

Q: I understand, Reverend, and nobody wants to do this; I understand. Nobody really wants to return—say, "Yes," knowing it means death, but it is a civic duty and responsibility, if a person can follow the law. Now, some people have such deep-seated feelings that they just can't do it period. But what we're asking you is, and what the lawyers for both sides and Judge James wants to know is, could you follow the law if the evidence showed you and 11 other people that the answers to both of those questions should be "Yes"? Would you and could you answer both of them "Yes"?

A: Yes, I could.

Q: And this is true even though you knew that you and the 11 others had answered them "Yes," that when you did, the Judge would assess the death penalty in accordance with the law? I'm assuming that the evidence is very much there to justify your answer, okay? Could you and would you answer both of those questions "Yes"?

A: I don't think so.

. . . . .

Q (By the Court): ... Could you answer Question 1 and 2 "Yes" if the evidence was there to support a "Yes" answer, but you further understood that if you answered both "Yes," I was going to assess the punishment of death because that was the only choice I had? Could you answer "Yes" if the evidence supported it, realizing that the result would be death?

A: Whether I could answer "Yes" and still be against—it would still be against my religious beliefs?

Q: That's the question we're asking. Some people say, 'Well, it's not me actually doing the assessing.' Some of them say, 'Well, wait a minute. If that's going to cause death, it's me doing it.' I'm not going to argue with whatever your mental thought patterns are, but I need to know from you whether or not you could answer both "Yes" if the evidence was there to support it, but you further realized that the fact that you answered them "Yes" would cause me by law to assess death? Can you answer them "Yes" if the evidence is there, knowing it would cause death to the Defendant, whoever the defendant might be?

A: Yes.

Q: You're sure we're communicating?

A: Yes.

Q: In other words, you can sit on a jury and you can answer both questions "Yes" if the evidence is there, knowing that that would cause the death of the Defendant?

A: I believe if I'm knowing that it's subject to the death penalty and I answer "Yes" to the questions, I feel myself that I'm encouraging the death penalty, which is completely against my belief or religion.

Q: Then would you automatically respond "No" to one of them to keep death from resulting, even though the evidence was to the contrary?

A: Yes.

(The challenge was then renewed and granted over objection.)

The relevant testimony of prospective juror Oligney was as follows:

Q (By the Court): Can you tell me how you feel about capital punishment where death results?

A: Well, I think that's to me as a Catholic, I don't believe in death. So I think that prison would be better.

(The Court then explained the trial and special procedures.)

(Ms. Oligney initially did not understand, and the Court then explained further.)

Q: Do you understand first of all that if a "Yes" answer appears to both of those questions, that the Defendant gets death?

A: Yes.

Q: Now if the evidence showed you at the hearing that the answers to these two questions ought to be "Yes"; there was plenty of evidence to support, you know, that you should say "Yes" to those questions, but further you realized that if you answered both of them "Yes" that the Defendant is going to get the death penalty, would you automatically vote "No" to one of them to avoid the Defendant getting the death penalty no matter what the evidence was?

A: No, I don't think so.

Q: Then could you vote "Yes" to both of them realizing that the Defendant would automatically get death?

A: I imagine so; I don't know.

Q: . . . Take a couple of minutes, make sure how you feel . . .

A: I don't think so.

Q: Let me reask the question so I'm fully sure that you understand what I'm asking. First of all, if those two questions are answered "Yes", the Defendant gets death. Now, would your conscience permit you to answer "Yes" to both of them if the evidence was there to support "Yes" answers? Let's suppose your conscience thought, "Yeah, they should be answered 'Yes'; that's right, they should be. But, I know he's going to get death if I do." Would your conscience permit you to answer "Yes" knowing that would result in the death of the Defendant?

A: I guess so.

Q: Well, now, when you say "I guess so," I understand that probably means "Yes, I could." But, it also could mean, "Well, I'm not sure and maybe I wouldn't." So I have to find out for sure. So you tell me what your feelings are and any way it goes is fine.

A: No, I couldn't; I don't think I could.

Q: Okay, you don't think you could what? You don't think you could vote "Yes"?

A: No.

Q: No matter what the facts were?

A: (Nodding negatively.)

Q: Is that what you're telling me?

A: Yes.

Q: No matter how horrible the facts, no matter how much evidence there was to support it, then the realization that death would result in your two "Yes" answers would keep you from answering them "Yes"; is that what you're saying?

A: Yes.

Q: ... So think about it; is that it?

A: Yes.

Q: Under no circumstances could you vote "Yes" on both of them because—knowing it would result in death; is that what you're telling me?

A: Yes.

. . . . .

(A challenge was now made, and defense counsel examined Ms. Oligney.)

Q (By defense counsel): ... Let's go directly ..., in a hypothetical fact situation just like a make-believe case, not this one, but just one where you were selected to sit on the jury and listen to the evidence in a capital murder case. And let's assume that it was a very horrible capital murder case where an elderly woman was raped and then beaten and shot and your jury that you were sitting on decided that without a doubt that that man should be found guilty. And then on that same capital murder case you were asked to listen to evidence to help you answer those two questions that the Judge has just been talking about with you. And the State put on evidence with regard to those two questions and presented you overwhelming evidence, and in your own mind and in your heart you formed the opinion that the answers to those two questions should be answered "Yes" based on that evidence that you had heard. Now, the Court had instructed you that if you answered each of those questions "Yes" then it would be the Court or the judge who would be bound to sentence that particular defendant to death. But, while you were sitting in that jury room, you and 11 of your fellow jurors decided in each of your respective minds that the answers to those two questions should in fact be "Yes." My question to you is, in that particular illustration, would you answer those questions "Yes" if the evidence called for "Yes" answers knowing the result of your answers?

A: Yes.

Q: All right, if you were satisfied in your mind that the answers should in fact be "Yes", then you would follow the law and answer them "Yes," knowing what your answers would direct the Judge to do?

A: Yes.

Q (By the Court): Let me make sure you understand where we are now because you've answered two ways, ... Now, are you telling me by what you answered him just then that if you answered both questions "Yes"—that means death to a defendant, you understand? Now, are you telling me if the facts were horrible, bad, and you really felt like they ought to be answered "Yes," but would your conscience permit you to answer "Yes," knowing that the defendant would receive the death penalty?

A: Yes.

Q: You could do that?

Q: Uh-huh.

Q: Even though you're fundamentally opposed to the death penalty?

A: Yes.

Q: But, in the right case, you could do that, right?

A: Yes.

Q (By prosecutor): Mrs. Oligney, you gave two sets of answers now, and one you answered to the Judge earlier that you could not answer those questions "Yes" knowing that the death of a defendant would result. And the Judge asked you if that applied in all circumstances and you said yes, it did, that you could not answer the questions "Yes." You remember giving that response to the Judge?

A: Yes.

Q: Then [defense counsel] asked you about a specific hypothetical case, not the facts in this case, but talked to you about the rape of perhaps an elderly lady who was killed by the man who attacked her, and you said, well, in that particular type of case, if the evidence called for it, you could not only find the man guilty of capital murder, but answer both the questions "Yes." Did you understand what he was asking you, [defense counsel], when he talked to you?

A: Was that___

Q: Not about the facts in this case, but he was giving you an imaginary fact situation.

A: Uh-huh. It's confusing to me. I can't hardly understand it.

Q: That's why I wanted to check with you because you gave the Judge one answer; you told him you didn't think you could answer those questions "Yes" knowing that the death of the Defendant would result, and you told [defense counsel] in the imaginary case that he asked you about, an imaginary woman being killed by an imaginary attacker during the course of a rape, that you felt in that particular case you could at least answer the questions "Yes" if you felt like the evidence showed you your answers should be "Yes." Did you see the difference in those two answers there?

A: Yes, I think so.

Q: All I want to ask you is what are your—... How do you feel now that you've had a chance to think about it, talk to His Honor, talk to the lawyers representing the Defendant, how do you feel about those two questions now and your answers to them?

A: Well, I think if you do have the evidence, it would be "Yes."

Q: Okay.

A: If you had enough evidence.

Q: So what you're telling me now or what you're telling the Court now, you could participate in a capital murder case. In other words, you could sit on a jury, and if the evidence proved to you the man was guilty of capital murder, you could return such a verdict?

A: I don't think so.

Q: You don't think you could?

A: No.

Q: Well, you see what kind of problem I have now because—

A: Yes, I see now.

Q: You've said a couple of different things.... I just want you to tell me what your feelings are and how you really believe and what your feelings are based on your beliefs as a human being, your religious beliefs, any moral convictions that you have, how do you feel?

A: Well, I don't think I could. I don't know very much about it, so I don't think I could.

Q: Well, we have tried to explain here for last couple of minutes, and you say you don't think you could do it?

A: No.

Q: What do you mean when you say, "You don't think you could do it"?

A: Well, I don't know very much about the laws.

Q: Well, just about every person like yourself who comes in doesn't know anything about the law, and the Judge will explain it to you and he will give you all the law that applies in this case in writing at a later time.

. . . . .

Q: ... Do you agree with the law or do you have a disagreement with the law about this type of case and what you would be required to do in this type of case? In other words, if you agree, fine; if you disagree, that's fine too ... Let me do this one more time, cover those two questions with you.

. . . . .

(Prosecutor explains special issues procedures again.)

Q: ... If the evidence showed you that your answer to the questions should be "Yes," would your conscience allow you to answer "Yes," or would you change one of your answers and instead answer "No," so that the Defendant would receive a life sentence rather than a death sentence by the judge?

A: I would say no.

Q: No meaning what?

A: No, no death penalty.

Q: No death penalty?

A: Uh-huh.

Q: And is that the way you feel regardless of what the facts showed you?

A: Yes.

Q: I could talk to you about a horrible baby killing or a horrible killing about a woman killed by her attacker or a person stabbed 3,000 times—I think we could all think of bad fact situations and horrible situations, but are you telling me that regardless of what the facts and circumstances might reveal to you that you would never answer both of those questions "Yes"?

A: I don't think I could say "Yes" to them.

Q: Okay. Are you telling me that your answers to those questions would be affected?

A: I think I would be affected if I did say yes.

Q: And do you think that would cause you to change your answers to either both the questions or one of the questions so that the Defendant receives life rather than death?

A: Yes.

Q: Are you sure on that? I don't want to have you agree with me or put words in your mouth. Are you positive about that?

A: I think I would say "No" on death.

Q: Then are you sure on that?

A: Yes.

Q: ... I'm just trying to find out if what you're telling me is the way Mrs. Oligney feels right now.

A: That's the way I feel about the death penalty. I don't think I could say he could have the death penalty.

Q: Okay. But you know how the punishment of death gets assessed, and that's by answering those two questions over there on that board?

A: Uh-huh.

(The prosecutor poses more hypothetical situations.)

Q: ... If you heard all the evidence and you believe that your answers to both questions should be "Yes" from the evidence, would your conscience—would your feelings about capital punishment that you told us about, would they allow you to answer both of those questions "Yes", knowing that if you answered the questions "Yes," the defendant would receive the punishment of death or would your feelings and conscience make you answer the question "No," in spite of the evidence so that the defendant would receive the life sentence rather than the death sentence?

A: I would probably say no because really I don't believe in death.

Q: When you say, "I probably would say no," are you telling me you probably would answer one of the questions "No"?

A: Yes.

Q: Can you imagine any fact situation where you would answer both questions "Yes"? Can you imagine any facts or circumstances that would change your mind from that feeling or is that the way you feel regardless of the facts?

A: That's the way I feel.

Q: So if I were to give you a bad example of a horrible killing in a horrible murder case, are you telling me your answers to those questions would be the same regardless of what the facts would show you?

A: Well, I would say no with the death.

(The challenge was now renewed and granted over objection.)