The STATE of Texas, Appellant,

v.

Thomas Michael LYONS, Appellee.

No. 2–88–021–CR.

Court of Appeals of Texas,
Fort Worth.

March 7, 1990.

Rehearing Denied April 10, 1990.

Jerry Cobb, Criminal Dist. Atty., Gwinda Burns, Asst. Dist. Atty., Denton, for appellant.

Fred Marsh, Denton, for appellee.

Before WEAVER, C.J., and KELTNER and JOE SPURLOCK, II, JJ.

## OPINION

WEAVER, Chief Justice.

The State appeals from the trial court's grant of a new trial to appellee, Thomas Michael Lyons (Lyons). *See* TEX.CODE CRIM.PROC.ANN. art. 44.01(a)(3) (Vernon Supp.1990). Lyons was convicted by a jury of driving while intoxicated (DWI). *See* TEX.REV.CIV.STAT.ANN. art. 6701*l*–1 (Vernon Supp.1990). The jury assessed punishment at sixty days confinement in the county jail, recommending that the confinement be probated, and a fine of $600. The trial court entered judgment in accordance with the verdict, suspending the jail

term and placing Lyons on probation for twenty-four months.

The trial court granted a new trial to Lyons based on Lyons' motion for new trial which alleged: (1) that the trial court misdirected the jury in its charge that the jury could find Lyons guilty if it found that Lyons did not have the normal use of his mental or physical faculties by reason of the introduction of alcohol into his body *or* if it found Lyons had a breath alcohol concentration of at least 0.10 grams of alcohol per 210 liters of breath; (2) that the State suppressed evidence by failing to videotape Lyons because it was the policy of the Department of Public Safety (DPS) not to videotape and that the jury's verdict of guilty was contrary to the court's charge on the failure to videotape; and (3) that the arresting officer failed to advise Lyons of his right to a blood test, and that the jury's verdict of guilty was contrary to the court's charge in that regard. Lyons maintained that the latter two errors rendered the jury's verdict contrary to the law and the evidence. *See* TEX.R.APP.P. 30(b)(9). In accordance with TEX.R.APP.P. 31(e)(2), the trial judge granted the motion without any indication of his findings in doing so.

We affirm the trial court's order granting the new trial.

■ We first dispose of appellee's "Additional Reply Point" where appellee complains that only the "head prosecuting attorney" is authorized to "handle" State appeals pursuant to TEX.CODE CRIM. PROC.ANN. art. 44.01. Appellee points out that the State is only authorized to appeal the grant of a new trial by way of a "prosecuting attorney." *Id.* art. 44.01(a)(3) and (d). "Prosecuting attorney" is defined as:

> [T]he county attorney, district attorney, or criminal district attorney who has the primary responsibility of prosecuting cases in the court hearing the case and does not include an assistant prosecuting attorney.

*Id.* art. 44.01(i). The rule states who may make an appeal on behalf of the State, but says nothing about who may "handle" the appeal. However, appellee makes no allegation that the relevant district attorney did not make this appeal. Appellee is complaining that the brief and argument were submitted to this court by an assistant district attorney, rather than by the district attorney himself.

We note that the notice of appeal by the State was signed by the district attorney. We believe that this action satisfied article 44.01(i) (that the State's appeal must be *made* by the district attorney, and not an assistant). We do not agree with appellee that the rule calls for the district attorney to personally "handle" every aspect of all appeals by the State. Not only is such a reading well beyond the meaning of the rule on its face, it also would be highly impractical to so constrain the activities of the district attorney. Therefore, we hold this appeal by the State was properly made, and appellee's reply point is overruled.

The State brings three points of error corresponding to three grounds alleged in the motion for new trial. Because any of Lyons' grounds may be sufficient to allow the grant of a new trial, we conclude that we must affirm the trial court's order if we determine that the court acted within its discretion in granting the motion under any one of the grounds alleged. We concentrate our discussion on the second ground, the issues related to the failure to videotape Lyons. However, we will first discuss the trial court's power to order a new trial.

■ From the early days of our State, appellate courts have recognized the difference between the appellate court's right to reverse a judgment and the trial court's power to exercise discretion in granting a new trial:

> The District Court must exercise a certain discretion in the granting or refusing of new trials. In considering the motion the court may judge not only of the competency but of the effect of evidence. There may be cases where the

court might well grant a new trial if, in the opinion of the presiding judge, injustice had been done; while, at the same time, should a new trial be refused, this court would not be warranted in reversing the judgment. The judge who presides at the trial is afforded much better and more ample means of judging of the merits of the application than the revising court can be. And therefore it is the governing rule of the action of this court, affirmed and enforced by repeated decisions from the earliest cases upon the subject to the present time, not to reverse the judgment of the District Court refusing a new trial unless some principle of law has been violated, misconceived, or disregarded to the prejudice of the party, or there is good reason to apprehend that injustice has been done in refusing the application.

*Jordan v. State,* 10 Tex. 479, 502 (1853) (affirming a criminal conviction).

During the period in which it had jurisdiction over criminal cases, the Texas Supreme Court repeatedly exhorted the district courts, who had both the jury and witnesses before them, to grant new trials whenever it appeared that justice had not been done. *See, e.g., Owens v. State,* 35 Tex. 361, 362 (1871–72). The high court noted that district courts did not have to abide by the stringent rules governing appellate courts, but should apply a more liberal rule in granting new trials. *Id.* at 362–63.

In *Mullins v. State,* 37 Tex. 337 (1872–73), the court concluded that:

The discretion of the District Court, in granting new trials, is almost the only protection to the citizen against the illegal or oppressive verdicts of prejudiced, careless, or ignorant juries, and we think the District Courts should never hesitate to use that discretion whenever the ends of justice have not been attained by those verdicts.

*Id.* at 339–40. *See also State v. Webb,* 41 Tex. 67, 69, 75–76 (1874) wherein the supreme court upheld the trial court's arrest of judgment which followed the jury's verdict of guilt. In *Webb,* the court again admonished trial courts to protect accused citizens "from the effects of law illegally administered" by the jury. *Id.* at 76.

While much of our criminal law has changed since the above four cases were decided, case law still holds that we may only reverse the trial court's grant of a new trial when we find a clear abuse of the trial court's discretion. *See, e.g., Appleman v. State,* 531 S.W.2d 806, 810 (Tex. Crim.App.1975); *Knox v. State,* 111 Tex. Crim. 601, 13 S.W.2d 378, 378 (1929); *State v. Thomas,* 768 S.W.2d 335, 336–37 (Tex. App.—Houston [14th Dist.] 1989, no pet.); 25 TEX.JUR.3d *Criminal Law* sec. 3570 (1983); and the following cases cited by Lyons: *Hill v. State,* 480 S.W.2d 670, 673 (Tex.Crim.App.1972); *Tsamouris v. State,* 472 S.W.2d 141, 142 (Tex.Crim.App.1971); *Bryan v. State,* 406 S.W.2d 210, 216 (Tex. Crim.App.1966), *cert. denied,* 386 U.S. 1023, 87 S.Ct. 1378, 18 L.Ed.2d 461 (1967); *Davis v. State,* 649 S.W.2d 380, 382 (Tex. App.—Fort Worth 1983, pet. ref'd).

The statute upon which Lyons based his second ground for new trial reads as follows:

Section 24. (a) Each county with a population of 25,000 or more according to the most recent federal census shall purchase and maintain electronic devices capable of visually recording a person arrested within the county for an offense under Article 6701L–1, Revised Statutes, or Subdivision (2), Subsection (a), Section 19.05, Penal Code.

(b) The sheriff of the county shall determine upon approval by the county commissioners court the number of devices necessary to ensure that a peace officer arresting a defendant for an offense listed in Subsection (a) of this section may visually record the defendant's appearance within a reasonable time after the arrest.

(c) The fact that an arresting officer or other person acting on behalf of the

state failed to visually record a person arrested for an offense listed in Subsection (a) of this section is admissible at the trial of the offense if the offense occurred in a county required to purchase and maintain electronic devices under this section."

Driving While Intoxicated Act, ch. 303, sec. 24, 1983 Tex.Gen.Laws 1568, 1605, hereinafter referred to as "the statute." This statute is located at the conclusion of TEX. REV.CIV.STAT.ANN. art. 6701*l*-1. Our court has stated that the statute contemplates and requires that visual recordings be made of DWI suspects. *See Weaver v. State*, 700 S.W.2d 776, 777 (Tex.App.—Fort Worth 1985, pet. ref'd).[1]

The substantive law underlying the trial court's grant of a new trial in this case is discussed in a trio of United States Supreme Court cases dealing with "access to evidence" issues. *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *United States v. Valenzuela-Bernal*, 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982).

In *Youngblood*, the State negligently failed to preserve semen samples which might have exonerated the defendant. *Youngblood*, 488 U.S. at ——, 109 S.Ct. at 334–35. However, the high Court found no suggestion of bad faith on the part of the police, and held:

> [U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

*Id.*, 488 U.S. at ——, 109 S.Ct. at 337. The Due Process Clause imposes an obligation on the police to preserve evidence in cases in which the failure to do so would constitute bad faith, that is:

> [T]hat class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.

*Id.*

> The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.

*Id.*, 488 U.S. at ——, 109 S.Ct. at 337 fn.

The trial court charged the *Youngblood* jury that, if it found the State had destroyed or lost evidence, they might "infer that the true fact is against the State's interest," and the jury found Youngblood guilty. *Id.*, 488 U.S. at ——, 109 S.Ct. at 335. The Supreme Court determined that, in the absence of bad faith, there had been no violation of the Due Process Clause. *Id.*, 488 U.S. at ——, 109 S.Ct. at 337.

In *Valenzuela-Bernal*, 458 U.S. 858, 102 S.Ct. 3440, the defendant was charged with knowing transportation of an alien illegally in the United States who last entered the United States less than three years prior to such transportation. *Id.*, 458 U.S. at 860, 102 S.Ct. at 3442. When the agents caught the defendant and three of the five passengers, the defendant made inculpatory statements, and the passengers admitted they were illegally in the country and identified the defendant as the driver. An Assistant U.S. Attorney concluded that the passengers possessed no material evidence and deported two of them to Mexico, pursuant to U.S. statutory authority and policy.

The Supreme Court, in upholding the conviction, relied on the competing policies found in the criminal and immigration laws, noted jail overcrowding by illegal aliens detained as witnesses, and the lack of any

---

1. While we also held in *Weaver* that the defendant's remedy for the State's failure to videotape was bringing into evidence the fact of the State's failure, we made no comment on the power of the trial court to order a new trial on the grounds that the State failed to preserve that visual evidence as required by the statute. *Weaver*, 700 S.W.2d at 777. *See* discussion below.

showing by the defendant that the testimony of the deported witnesses was material or favorable to the defense. Although the defendant and deported witnesses were together throughout commission of the crime, the defendant made no effort to show materiality of the lost testimony or that it would be favorable to the defense. *Id.,* 458 U.S. at 872–73, 102 S.Ct. at 3449. The Supreme Court stated that materiality and favorability could be shown through testimony or affidavit of the defendant, and concluded that sanctions were warranted "only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *Id.,* 458 U.S. at 873–74, 102 S.Ct. at 3449–50.

In *Valenzuela–Bernal,* the Court also distinguished *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). *Id.,* 458 U.S. at 870–71, 102 S.Ct. at 3448. The Court noted that the unnamed informer in *Roviaro* was the sole witness in a position to amplify or contradict the testimony of government witnesses, that a government witness testified that the informer denied ever having seen the defendant, and that by withholding his identity the government had deprived the defendant of highly relevant testimony. *Id.*

In *Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, several drunken driving defendants contended that the trial courts should have suppressed the results of their intoxilyzer tests because the government did not preserve samples of their breath. Although it was technically feasible to preserve such samples, California officers did not ordinarily do so, and the Court held that although they failed to preserve breath samples, the officers acted in good faith in accordance with normal procedures. *Id.,* 467 U.S. at 488, 104 S.Ct. at 2533. The *Trombetta* Court held that in order to show a constitutional violation the unpreserved evidence must have possessed an exculpatory value that was apparent before destruction and be of such a nature that the defendant could not reasonably obtain comparable evidence. *Id.,* 467 U.S. at 488–89,

104 S.Ct. at 2534. The Court noted the high accuracy of the intoxilyzer, the extremely low odds that the breath samples were exculpatory, and the means by which defendants could show error in the tests (including chemicals in the blood of those who are dieting). There is no indication in the opinion that the defendants offered any evidence, even their own testimony. Finally, the high Court noted that, although the Due Process Clause of the fourteenth amendment does not require preservation of breath samples, state courts and legislatures were free to adopt more rigorous safeguards governing admissibility of scientific evidence. *Id.,* 467 U.S. at 491, 104 S.Ct. at 2535 n. 12.

Our court recently discussed this "access to evidence" issue in a case very similar to the case at bar. *See Gamboa v. State,* 774 S.W.2d 111, 111–12 (Tex.App.—Fort Worth 1989, pet. ref'd). *Gamboa* was a DWI case tried by the same judge in the same court as in the instant case. Our court held therein that the trial court did not err in failing to grant the defendant's motion to suppress, to dismiss, or for instructed verdict; or in failing to sustain defendant's evidentiary objections; or in failing to instruct the jury on suppression of favorable evidence. In that case, the DPS intoxilyzer operator destroyed videotapes after the defendant took an intoxilyzer test. The officer stated that tapes were not preserved by DPS when the accused took a breath test. *Id.* at 112. In *Gamboa,* nothing in the record indicated that the destroyed videotapes constituted evidence favorable to the accused, and our court concluded that the defendant showed no bad faith on the part of the DPS. *Id.*

We now examine the evidence and jury charge relevant to the second ground for new trial in the case at bar: suppression of evidence by failing to videotape Lyons, a DWI suspect.

Officer Donald Stewart of the Texas Department of Public Safety testified that he observed Lyons weaving and straddling a lane on a highway in Denton County on

July 3, 1987. The officer pulled Lyons over and administered a field sobriety test, which Lyons failed to adequately perform. After Stewart arrested Lyons, he took him to the videotape/intoxilyzer room of the county jail, read him the DWI statutory warnings, and administered an intoxilyzer breath test on Lyons. Stewart testified that Lyons remained in his presence the entire time before administration of the intoxilyzer, and that he observed Lyons for the fifteen minutes prior to the test, assuring that Lyons did not put anything in his mouth, belch, or regurgitate. The intoxilyzer test revealed that Lyons' breath contained 0.21 grams of alcohol per 210 liters of breath. Stewart did not inform Lyons of his right to have a blood test performed in accordance with TEX.REV.CIV.STAT. ANN. art. 6701$l$–5, sec. 3(d) (Vernon Supp. 1990).

Officer Stewart testified that, although videotape equipment was available and operable when he arrested Lyons, he did not videotape him, because it was the policy of the district attorney's office and the local office of the DPS not to videotape defendants who took the breath test. Officer Stewart testified that he was aware that the law required law enforcement agencies to maintain the ability to videotape in Denton County.[2] Stewart also acknowledged that, if he had videotaped Lyons, the jury could have had the benefit of the videotape to look at the defendant's actions and to see if he remained in the officer's presence while the officer prepared the breath test.

Officer James Hughes, DPS technical supervisor, testified that his duties included certifying intoxilyzer operators, maintaining the instruments, and training officers who use the machines. Although he trained the officers on their obligations to give warnings and that individuals have a right to a blood test if they request it, he left it to the officers' discretion to determine whether to advise the individuals of

their right to a blood test. He assumed that officers would inform individuals of this right, but was not familiar with DPS policy on providing this information. He opined that an individual who was unaware of the law allowing him to take a blood test would not know to ask for one.

Officer Hughes also testified that the first step the intoxilyzer operator must take in performing the test is a fifteen-minute observation period, and that failure to perform the observation could vitally affect the result of the test.

Lyons was able to impeach Officer Stewart's testimony regarding details of Lyons' appearance on the night of the arrest and the appearance of Lyons' automobile. Lyons denied that Stewart read him the DWI statutory warnings.[3] He testified to and offered other evidence of physical disabilities to show why he could not perform the sobriety tests. He described traffic congestion and construction on the highway to explain why he straddled the lane, and testified to an unusual diet involving herbs and vitamins, which he argued could have affected the intoxilyzer results. Lyons further testified that he wandered away from the intoxilyzer room while Officer Stewart was getting the intoxilyzer ready, and did not return to the area until another officer sent him back there. Lyons admitted drinking several glasses of wine within the six or seven hours before arrest, and a portion of a can of beer shortly before the arrest.

Lyons testified that the alcohol did not have any effect on him, and he presented testimony from his fiancee that he did not appear to be intoxicated approximately five hours after his arrest, when he was released from custody.

Nancy Jessee, chief misdemeanor prosecutor for the Denton County District Attorney's Office at the time of arrest and trial, was called as a defense witness. She testi-

---

2. The trial court later took judicial notice that Denton County had a population of over 25,000.

3. Officer Stewart testified that he did not have Lyons sign the warnings as it was not required by Department policy.

fied that, on July 2, 1987, she wrote a letter to the local DPS sergeant which read, in pertinent part: "Effective immediately, our office is requesting that all DWI suspects be videotaped regardless of whether they take breath tests."[4] Jessee volunteered that the letter was particularly designed so that the DPS would videotape suspects whose breath test indicated the lower limits of legal intoxication, such as .10 through .12. Since the officers would not know the intoxilyzer results until after the videotape was made, she felt it was better to have all suspects videotaped.

Jessee denied that the district attorney's office had any authority to dictate videotaping policy to the DPS, but admitted that she would file any DWI case in which there was sufficient evidence without the videotape. Although Jessee agreed that the statute required videotaping equipment to be available in Denton County, she declined Lyons' counsel's repeated invitations to deduce that the equipment must also be *used* in order to comply with the "spirit of the law" and not render it a nullity. She expressly denied that the videotape statute conveyed an expectation that suspects would be videotaped in the counties required to maintain videotape capability, stating, "Well, no. I don't think that's necessarily the case. Law enforcement officers carry guns, but they don't necessarily use—always use those guns."

On rebuttal, Officer Stewart testified that Jessee's letter was received after the arrest in this case.

The trial court instructed the jury that Denton County was required to purchase and maintain electronic devices capable of visually recording the appearance of a person arrested for DWI. The court also instructed the jury that, unless it found beyond a reasonable doubt that the official

policy and actions of the *criminal district attorney, including assistant criminal district attorneys,* did not violate the state laws or constitution or federal constitution, or that such violation did not result in the suppression of exculpatory or mitigating evidence, it was to disregard testimony regarding Lyons' appearance after he was arrested or the evidence of the analysis of the breath specimen.[5]

It appears that the State maintains that the jury's guilty verdict amounts to a finding that the State acted legally in failing to videotape or, at least, did not suppress any exculpatory or mitigating evidence. However, a review of the charge reveals that no such finding can be implied from the charge to the jury. In the first place, the charge did not inform the jury that the law required peace officers to actually *use* the equipment and videotape DWI suspects.[6] Second, the charge did not give the jury the option of determining whether *the DPS policy or actions* were inconsistent with state law. While Nancy Jessee, the chief prosecuting attorney denied that the district attorney's office had any videotape policy or ability to dictate such policy to the DPS, Officer Stewart stated unequivocally that it was the local DPS policy not to videotape DWI suspects who submitted to a breath test. The jury was never informed that it should disregard evidence if it found the *DPS* had suppressed exculpatory or mitigating evidence by failing to comply with the law's requirement that DWI suspects be videotaped.

The operative facts are uncontroverted and were presented through the testimony of the DPS officer, state law enforcement officers, Donald Stewart and chief misdemeanor prosecutor, Nancy Jessee. The record clearly shows that, although the videotape equipment was operable at the time

---

4. According to Jessee this letter was mailed a day or two after July 2nd.

5. We have attempted to summarize this somewhat confusing portion of the charge, which portion takes up four double-spaced legal size sheets of paper.

6. *See Weaver,* 700 S.W.2d at 777 (interpreting section 24 of TEX.REV.CIV.STAT.ANN. art. 6701*l*-1 to require that visual recordings be made of DWI suspects).

of Lyons' arrest, Officer Stewart did not videotape him because it was local DPS policy not to videotape when the DWI suspect took the breath test. The district attorney's office had no policy to insure the DWI suspects were videotaped prior to its letter of July 2nd, which did not reach the DPS office until after Lyons' arrest. If Lyons had been videotaped, the jury could have seen his appearance and actions and could have determined whether he remained in Officer Stewart's presence prior to the breath test for the critical fifteen-minute observation period. Lyons' evidence raised substantial questions about the accuracy of the intoxilyzer and his state of intoxication.

Three major factors distinguish *Youngblood, Valenzuela–Bernal, Trombetta,* and *Gamboa* from the case at bar. (1) In the other cases bad faith on the part of the government was negated; in Lyons' case, the trial court may well have concluded that the DPS officer acted in bad faith, particularly in light of the *Youngblood* definition of bad faith (police knowledge of the exculpatory value of the evidence). *Youngblood,* 488 U.S. at ——, 109 S.Ct. at 337; *see also Trombetta,* 467 U.S. at 489, 104 S.Ct. at 2534. Also, unlike the situation in *Valenzuela–Bernal,* the DPS officer did not have conflicting laws to obey. *Valenzuela–Bernal,* 458 U.S. 858, 102 S.Ct. 3440 (criminal law and immigration law were in conflict there). State law required that he videotape Lyons. *See Weaver,* 700 S.W.2d at 777. (2) In the other cases, there was no mention of any evidence which tended to show that the missing evidence would likely be favorable to the defendant; in the instant case, there was evidence from which the trial court could have concluded the videotape would likely have favored Lyons' defense (*i.e.,* Lyons' testimony and his fiancee's testimony). (3) In the other cases the trial court's ruling was against the defendant and the appellate court upheld the trial court's decision. In the case at bar, the trial court ruled in favor of the defendant. By upholding the trial court's grant of a new

trial we would not be second guessing a ruling that was within the trial court's discretion to make, as discussed earlier in this opinion. *See Mullins,* 37 Tex. at 339–40; *Jordan,* 10 Tex. at 502; *Appleman,* 531 S.W.2d at 810; *Thomas,* 768 S.W.2d at 336–37; *Davis,* 649 S.W.2d at 382.

The State contends that the *only* remedy available to Lyons was to introduce evidence showing the State failed to videotape him. The State relies on the following cases: *Shaw v. State,* 728 S.W.2d 889 (Tex. App.—Houston [1st Dist.] 1987, no pet.); *Maddox v. State,* 705 S.W.2d 739, 741 (Tex. App.—Houston [1st Dist.] 1986) *pet. abated due to appellant's death,* 770 S.W.2d 780 (Tex.Crim.App.1988); *Irion v. State,* 703 S.W.2d 362, 364 (Tex.App.—Austin 1986, no pet.); *Weaver,* 700 S.W.2d at 777–78. Lyons responds by distinguishing each of these cases, and pointing out that the decision of whether to grant a new trial rests in the sound discretion of the trial court. We also consider and distinguish *State v. Fox,* 772 S.W.2d 455, 455–57 (Tex. App.—Beaumont 1989, no pet.).

In *Irion,* 703 S.W.2d at 364–65, the Austin Court of Appeals concluded that the failure to videotape the defendant did not render the evidence of DWI insufficient. In the instant case, no insufficiency question is raised.

In *Shaw,* 728 S.W.2d at 892–93, the court of appeals overruled the defendant's contention that the trial court should have instructed the jury that it could consider the fact that the videotape was destroyed in considering the credibility of the State's witness on the issue of intoxication. The evidence showed that the destruction was inadvertent. The Houston First Court of Appeals stated that Shaw's only remedy under the statute was to present evidence of destruction of the videotape to the jury. *Id.* In *Maddox,* 705 S.W.2d at 741, the same court of appeals held that the trial court did not err in refusing to give appellant's requested instruction to the jury which, in effect, instructed the jury to acquit the defendant because the county did

not have videotape equipment available eight days after the statute required it to have the equipment. The appeals court stated that the only sanction imposed by the statute was to permit the defendant to show that the county did not maintain or use the equipment. In *Fox*, 772 S.W.2d at 455–57, the DWI defendant was offered a videotape, and refused to be videotaped. The trial court dismissed the complaint and information based on defendant's motion which complained about the failure to videotape. *Id.* While we do not necessarily endorse the *dicta* in *Fox*, we conclude that it is clear that the *State* did not deprive the defendant of any evidence; he effectively suppressed the potential evidence himself.

Finally, in *Weaver*, 700 S.W.2d at 777–78, our court held that the trial court did not err in refusing to dismiss the DWI information due to failure to videotape the defendant. We concluded that the only sanction imposed by the statute was presentation of this fact to the jury. In *Weaver*, the City of Hurst, in Tarrant County, had not begun videotaping DWI suspects three months after the statute went into effect, but began doing so one month later. *Id.* at 777. We concluded, in that instance, the defendant had not been deprived of due process due to the failure to videotape. In addition to overruling Weaver's contentions, we also expressly overruled the State's contention that the statute does not mandate that the suspect be visually recorded, holding that "the statute does contemplate and require that visual recordings be made." *Id.*

Although *Weaver* may, at first glance, appear to be precedent which controls disposition of the instant case, it is distinguishable from the instant case on the same basis that all of the other cases (except *Irion* and *Fox*) are distinguishable. In each of these cases, the appellate court's only authority was to determine whether the trial court erred in failing to grant the relief requested by the defendant. None of

these cases holds that the trial court was *not permitted* to grant relief to the defendant; they hold that the law does not *mandate* that additional relief be given to the defendant.

We hold that the trial court did not abuse its discretion in granting a new trial based on Lyons' contentions regarding the State's failure to videotape. *See Mullins*, 37 Tex. at 339–40; *Jordan*, 10 Tex. at 502; *Appleman*, 531 S.W.2d at 810; *Thomas*, 768 S.W.2d at 336–37; *Davis*, 649 S.W.2d at 382. As in *Roviaro*, 353 U.S. at 64, 77 S.Ct. at 630, the videotape could have, in effect, provided the only "witness" capable of contradicting the officer's testimony. This is particularly true in light of Officer Stewart's failure to advise Lyons of his right to a blood test. Under the circumstances in this case, including the DPS officer's failure to videotape Lyons, the trial court could have concluded that the officer intentionally failed to preserve material evidence which would have been likely to exculpate the defendant and to have affected the outcome of the case. The trial court could also have concluded that the DPS officer acted in bad faith.

Furthermore, although not necessary to the above holding, the trial court also could have concluded that the jury charge on guilt did not give the jury adequate instruction regarding the failure to videotape.[7] As discussed previously, the charge did not require the jury to disregard evidence of Lyons' intoxication if it found that the *DPS* (as opposed to the criminal district attorney) had suppressed exculpatory or mitigating evidence by violating the Due Process Clause or the statute in failing to videotape Lyons.

Because we find the trial court did not abuse its discretion in granting a new trial based on Lyons' second ground for new trial, we need not discuss the points of error regarding the other two grounds for

7. We make no holding that the trial court was required to so instruct the jury; only that it had discretion to do so and to see that it was done properly. *Compare Drewett v. State*, 704 S.W.2d

43, 45 (Tex.Crim.App.1986) (holding that it was improper for the trial court to instruct the jury that it could *not* consider the State's failure to videotape the defendant).

new trial. The trial court's order granting new trial is affirmed.

KELTNER, J., not participating in decision.