Becker v. State



COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS



)
 

ANSELMO CARRILLO, )
 No. 08-01-00471-CR

)


 Appellant,
)
 Appeal from

)
 

v.
)
 41st District Court

)


THE STATE OF TEXAS,
)
 of El Paso County, Texas

)


 Appellee.
)
 (TC# 20000D02873)


O P I N I O N



 Anselmo Carrillo appeals his conviction for intoxication manslaughter. A jury found
Appellant guilty and assessed his punishment at imprisonment for a term of twenty years. The trial
court entered in the judgment an affirmative finding on the use of a deadly weapon. Tex.Code
Crim.Proc.Ann. art. 42.12, § 3g(a)(2)(Vernon Supp. 2003). We affirm.

FACTUAL SUMMARY


 Sharon Allen and her husband, Ronnie Allen, traveled from Hinton, Oklahoma with their
thirteen-month-old daughter, Hanna, to visit Ronnie's mother who was in the hospital. While in
El Paso on March 13, 2000, they were in an auto accident and Ronnie was killed. Sharon, who
suffered a broken pelvis, fractured back, broken clavicle, and head injury, did not remember anything
about the accident. Hanna also had a head injury, a broken clavicle, and broken legs. 

 On March 13, 2000 shortly before 9 p.m., Phillip Meili was in his pickup truck at the
intersection of Redd Road and Doniphan waiting for the light to change so that he could turn onto
Doniphan. After the light facing Doniphan turned red, the light facing Meili turned green and he
began to enter the intersection. As he began to turn, Meili saw that a red pickup truck traveling north
on Doniphan was not going to stop so he hit his brakes. Meili watched the red truck go through the
red light and hit a minivan that had proceeded into the intersection from Redd. The driver of the red
truck, identified by Meili as Appellant, did not slow down or make any effort to stop before colliding
with the minivan but maintained a constant speed. The force of the collision caused the minivan to
roll over and it landed on its side. Meili estimated that the red truck was traveling 45 miles per hour
and the driver did not seem to be aware of the traffic light. The truck was at least 100 feet from the
intersection when the traffic light facing Doniphan turned red.

 Meili approached the minivan and saw a male driver, a female passenger dangling
unconscious from her seat belt restraint, and a child in the back seat. Seeing that they were critically
injured, Meili immediately telephoned 911 and asked them to send more than one ambulance. Meili
then went to the gas station and asked for a fire extinguisher because the minivan's gas tank was
leaking. By the time he returned, emergency services had begun arriving and had removed the child
from the minivan. Meili saw Appellant staggering and leaning back against a vehicle. He appeared
clueless about what was going on or what he had done.

 Victor Ortiz was at the Doniphan and Redd Road intersection at the time of the accident. 
Ortiz had just left the Diamond Shamrock gas station and was the second car in the left-turn lane on
Redd. His light was red. A pickup was in front of him in the turn lane and a minivan was next to
it. Ortiz was looking to his left down Doniphan when he saw a vehicle approaching the intersection. 
When he looked back and saw that the light had turned green, he felt that the vehicle approaching
the intersection was not going to stop since it had not slowed down at all. Ortiz made up his mind
that he was not going to move even though his light had turned green. He saw the truck in front of
him initially move forward a few feet as if it intended to enter the intersection but the driver stopped. 
The minivan, however, pulled into the intersection and the other vehicle struck it without making
any effort to brake or avoid the collision. The minivan became airborne, traveled across Doniphan,
and landed on its side. Ortiz pulled back into the parking lot of the Diamond Shamrock.

 Stephen Dworak, a college student, and two of his friends were also at the Redd Road-Doniphan intersection at the time of the accident. They were returning to El Paso from the Gila
National Forest and were stopped at the red light on Redd. Tired from a long day and annoyed by
the length of the red light, Dworak was watching the lights on Doniphan. After observing the light
on Doniphan change from green to yellow and then to red, Dworak turned his attention to the light
facing him. It turned green approximately three seconds after the light on Doniphan had turned red. 
Dworak watched the minivan in front of him proceed very slowly into the intersection, and out of
the corner of his eye, Dworak saw movement. He then saw a red truck approaching the intersection
at what he believed was a high rate of speed. The truck did not brake or take any evasive action
before hitting the driver's side of the minivan. The minivan rolled several times and came to rest
on its side approximately 75 feet from the initial point of impact. Dworak ran to the Diamond
Shamrock and telephoned 911. He went over to the red truck to see if they needed assistance but
neither the male driver, whom he identified as Appellant, nor the female passenger, identified in the
record as Mrs. Carrillo, appeared to have any serious injuries. Dworak then approached the minivan
and saw that both passengers were unconscious and seriously injured. Dworak looked into the back
of the vehicle and saw a child in the back seat strapped into a car seat and bleeding from a head
wound. He notified other onlookers about the child and someone crawled into the vehicle through
a window and removed her. The fire department arrived at about the time and the child was handed
to a fireman. Dworak later returned his attention to Appellant. Appellant could not walk straight
and he appeared unaware of his surroundings or what had happened. In Dworak's opinion,
Appellant's behavior was consistent with intoxication but Dworak had not been close enough to
Appellant to say whether or not he had been drinking.

 Twenty-year-old Jeremy Tarpley was a passenger in the vehicle with Dworak and Jeremy
Sackert. He did not see the impact of the accident but heard it and saw the minivan rolling and the
truck spinning. After the vehicles came to a rest, he went to assist the people in the truck. He could
not get the driver's door open but was able to open the passenger's door. Both Appellant, who was
driving the truck, and the female passenger were moaning and dazed, but conscious. Because
gasoline had spilled around the truck, Tarpley unbuckled their seat belts to help them get out. The
female passenger kept pointing to the driver's door and stating "la puerta" so Tarpley assumed she
wanted him to open the driver's door. With considerable effort, Tarpley was able to pull the door
open and he assisted Appellant out of the vehicle. Appellant could not stand on his own so he leaned
on Tarpley until the police arrived. Appellant repeatedly stated, "agua, agua, agua" and Tarpley
believed he needed a drink of water. While still being supported by Tarpley, Appellant unzipped his
pants and urinated on the side of the truck. 

 Maxwell Davis was traveling on Doniphan and saw the impact of the truck and minivan. 
Because he had medical training and EMS experience, Davis stopped and attempted to assist those
injured in the accident. He first approached the occupants of the truck. He opened the passenger
door to the truck and beer bottles fell out. He also smelled an odor of alcohol inside of the truck. 
The female passenger was in the floorboard but she started moving and moaning. When the driver
started moving around, Davis told him to remain still. Davis then went over to the minivan. After
deciding to enter the minivan, Davis wrapped an article of clothing around his hand and punched a
hole in the windshield of the minivan so that the EMS personnel could talk to him while he was
inside. He instructed other onlookers to steady the vehicle and he entered it through the driver's
side. He assessed the child first and determined that she had a pulse. The driver had only a faint
pulse but the female passenger had the strongest pulse of the three occupants. He returned his
attention to the baby and discovered that she had started turning a purplish color. He opened her
mouth and administered CPR while deciding whether to remove her from the vehicle. After
discussion with an off-duty police officer standing outside the vehicle, he decided to remove her and
handed her to the police officer. Davis then went back to the male driver and discovered that his
pulse had become weaker and slow. As he attempted to get into position to give the driver CPR, he
found that the driver's pulse had stopped, indicating to him that the victim was either dead or dying. 
Davis then focused on the female passenger. About that time, emergency personnel arrived and he
exited the vehicle. 

 Morris Williams, an El Paso police officer, lives two to three hundred yards from the
intersection of Doniphan and Redd Road. On the evening of March 13, 2000 at around 9 p.m., he
heard the impact of an auto accident. He knew from the sound that it was serious so he put on some
shoes, grabbed his police radio and flashlight, and drove over to the scene. He saw Appellant seated
in the driver's position of the truck and a female seated in the passenger seat. Both of them were
conscious and moving. When Williams heard a woman screaming, he decided to go over to the
minivan because it appeared to have taken the brunt of the impact. Because the scene was chaotic,
Williams used citizens on-site to stop all lanes of traffic in an effort to prevent anyone else from
becoming injured. Williams then approached the minivan to assess the condition of the occupants. 
The female passenger was yelling and the male driver "didn't look like he was with us anymore." 
Williams climbed on top of the vehicle and saw a child inside. Neither the child nor the male driver
were making any sounds. Upon seeing gasoline accumulating around the minivan, Williams became
concerned that it would catch fire or explode. He instructed the civilians to begin throwing sand on
the gasoline and decided that Maxwell Davis would enter the vehicle and assess the baby's
condition. Davis extricated the baby from the car seat and handed her to Williams, who moved her
away from the van in the event it caught fire. As he held the child and looked around the scene to
determine what else needed to be done, he noticed the female passenger from the red truck kicking
something under the vehicle. He also saw Appellant urinating on the vehicle. After turning the child
over to emergency personnel, Williams walked over to the truck to investigate what he had seen. 
He looked under the truck and found several beer bottles. At this point, Appellant, who weighed
approximately 290 pounds, was on a stretcher. Williams went over to assist the two EMS
technicians who were attempting to pick up Appellant and place him into the ambulance. Williams
went to the portion of the stretcher nearest Appellant's head and he noticed a strong odor of alcohol
coming from his person and breath. He also observed that Appellant was in a daze as the result of
alcohol consumption. Based upon his experience and observations, Williams formed the opinion
that Appellant was intoxicated. 

 Joe Acuna, Jr., an El Paso police officer, was dispatched to the accident. When he arrived,
EMS and other emergency personnel were already on the scene and attending to the people in the
van. Acuna and his partner, Robert Cardenas, parked in front of Appellant's truck. Cardenas
attended to Appellant while Acuna checked on the female passenger, Mrs. Carrillo, who was lying
on the seat. As he approached the cab of the truck, Acuna smelled a strong odor of alcohol and he
saw beer bottles on the floorboard. Some bottles were empty, one was unopened, and one bottle had
some liquid in it. Acuna did not get close to Appellant but he could smell alcohol on the breath of
Mrs. Carrillo. 

 Roberto Cardenas attended to Appellant after arriving at the scene of the accident. Appellant
stood near the back of the truck with both hands on the truck. Cardenas immediately noticed a
strong odor of alcohol on Appellant's person and breath and he had difficulty standing. As Cardenas
attempted to talk with Appellant to find out what had happened, he discovered that Appellant's
speech was slurred and he had difficulty speaking. When Appellant indicated that either his chest
or stomach had been injured by the seat belt, Cardenas walked him over to an EMS vehicle and had
him sit down. In Cardenas's opinion, Appellant was intoxicated. 

 Reymundo Rincon, an El Paso police officer, responded to the scene of the accident and
assisted with traffic control. Eventually, a supervisor instructed Rincon and his partner to proceed
to William Beaumont Hospital to guard Appellant and ensure that he did not escape. Once at the
hospital, Rincon was instructed to pick up a blood kit in order to take a sample of Appellant's blood
for testing. Rincon picked up the blood kit and returned to the hospital where he spoke with an LVN
about drawing the blood. Rincon removed the vial from the sealed kit and the LVN drew
Appellant's blood at 11:35 p.m. Appellant, who smelled of alcohol, was asleep and unaware of the
blood being drawn despite the LVN's efforts to inform him of what they were doing. The LVN
returned the sample to Rincon and he wrapped the sample and sealed it before transporting it to the
police department for storage in the evidence refrigerator. The blood was subsequently tested and
found to have an alcohol concentration of .20 grams of alcohol per one hundred millileters of blood. 
 Following Appellant's release from William Beaumont the following morning, Frank
Escudero of the El Paso police department booked Appellant into jail at approximately 6:30 a.m. 
Escudero, who had face-to-face contact with Appellant, observed that he had an odor of alcohol on
his breath and he appeared slightly intoxicated.

 Ruben Cisneros is an El Paso police officer assigned to the special traffic investigation or STI
section of the police department. Cisneros did not find any pre-accident skid marks or brake marks
for either vehicle. The van had initially traveled 54 feet from the point of impact, then rolled over
on its right side and slid on metal another 75 feet for a total of 129 feet from the point of impact. 
The truck traveled 51 feet from the point of impact. Based upon data collected at the scene, Cisneros
calculated that the van was traveling 16.44 miles per hour at the time of the accident while the truck
was traveling 56.4 miles per hour. He also determined that the lights at the intersection were
sequencing properly that evening.

 The defense rested without offering any evidence. The jury found Appellant guilty of
intoxication manslaughter as charged in the indictment. During the punishment phase, the jury
learned that Appellant was on probation for driving while intoxicated at the time of the accident.

RESTRICTION OF VOIR DIRE


 In Issue One, Appellant complains that the trial court erred in prohibiting him from asking
the venire panel whether they agreed or disagreed with the law that makes probation available in
intoxication manslaughter cases. He further contends that the error is not subject to a harm analysis. 
The State concedes that the trial judge erred in prohibiting the question but it argues that the error
was harmless because the availability of community supervision had been thoroughly covered before
defense counsel began his voir dire and defense counsel was permitted to question those jurors who
indicated a reluctance to consider probation in this type of case. We agree with the State that the
error is harmless.

 The right to ask proper voir dire questions is included within the right to counsel under
Article I, Section 10 of the Texas Constitution. Gonzales v. State, 994 S.W.2d 170, 171
(Tex.Crim.App. 1999). Because the erroneous restriction of voir dire is not a structural error, it is
subject to harm analysis under Rule 44.2. See id. (finding that the Texarkana Court of Appeals erred
in concluding that the error is incapable of analysis for harm). The appropriate standard is that found
in Tex.R.App.P. 44.2(a) which requires the appellate court to reverse unless it is determined beyond
a reasonable doubt that the error did not contribute to the conviction or punishment. Gonzales v.
State, 2 S.W.3d 600, 604 (Tex.App.--Texarkana 1999, pet. ref'd)(opinion on remand).

 The prohibited question sought to discover the prospective jurors' views on the
appropriateness of community supervision in an intoxication-manslaughter case. As pointed out by
the State, both the trial court and the prosecutor thoroughly covered this issue in their remarks to the
venire. Further, Appellant was permitted to ask, "[H]ow many of you disagree that there should be
probation for such a case upon a finding of guilt?" Five venirepersons responded that they could not
consider a probated sentence. Appellant then sought to ask the prohibited question. Despite the trial
court's refusal to allow the question, Appellant was permitted to ask each venireperson if he or she
"could fairly consider probation" upon finding a hypothetical defendant guilty of intoxication
manslaughter. Twelve members of the venire indicated they could not consider probation. Given
that the trial court permitted Appellant to thoroughly cover the subject matter and explore the views
of the venire on the appropriateness of probation, we are satisfied beyond a reasonable doubt that
the error did not contribute to Appellant's punishment. Issue One is overruled.

MISSTATEMENT OF LAW DURING VOIR DIRE


 In Issue Two, Appellant argues that the trial court made a misstatement of law during voir
dire by informing the jury that intoxication manslaughter simply requires that a person cause the
death of another person when driving while intoxicated. According to Appellant, the trial court
failed to make the jury aware of the causation element. (1)

 After informing the venire panel that Appellant was charged with intoxication manslaughter,
the trial judge explained the elements of the offense by paraphrasing the allegations contained in the
indictment. The trial court's explanation included the causation element found in Section 49.08 of
the Penal Code. The prosecutor also explained to the panel that the State must prove the elements
of driving while intoxicated and additionally show that because of that intoxication by accident or
mistake the defendant caused the death of another person. The prosecutor reiterated the causation
element by stating, "When the alcohol causes the accident or mistake, that's intoxication
manslaughter." In response to a question by a venireperson, the prosecutor repeated the elements
of the offense, emphasizing that the defendant's intoxication must cause the accident that led to the
victim's death. Appellant's counsel echoed these explanations of the offense during his own voir
dire, stating that "A person commits an offense if the person operates a motor vehicle in a public
place and he is intoxicated and, by reason of the intoxication, causes the death of another by accident
or mistake." At that point, one venireperson expressed confusion about the elements of the offense
and the trial court informed her that they would speak with her individually. The court then stated
the following:

 Let -- let me just so the panel understands, the offense is intoxication manslaughter. 
Within that offense is the offense of driving while intoxicated, which is a
misdemeanor type of offense, but what he's charged with is more than that. 
Again, it's described as while driving intoxicated, is the accusation, he causes the
death. So -- 


Appellant then interrupted the judge's explanation by objecting to the court's explanation and the
failure to explain the causal relationship between the intoxication and the accident. The trial court
overruled the objection and Appellant's counsel then went on to discuss the causation element with
the panel. Based upon their comments, the members of the venire indicated an understanding of that
element. When the discussion became too fact intensive, the trial court interrupted, reminding the
venire that the parties could not go into the facts of the case. The court continued:

 The charge -- Mr. Gandara is pointing out the charge here. And what is charged is
that by accident or mistake that the State is bound to prove that by reason of that
intoxication it caused the death of the person. And that's what he's trying to allude
to, rightfully so. 


 When the challenged statement is examined out of context, it could be viewed as a
misstatement of law. However, the trial court correctly instructed the jury regarding all of the
elements of the offense, including the causation element, both before and after the alleged
misstatement. Accordingly, we find no error.

 Even if we viewed the remark as a misstatement of law, it would not warrant reversal because
the record does not demonstrate that Appellant has suffered any resulting harm. See Williams v.
State, 622 S.W.2d 116, 119 (Tex.Crim.App. 1981); Kelley v. State, 845 S.W.2d 474, 479
(Tex.App.--Houston [1st Dist.] 1993, pet. ref'd). Because this is non-constitutional error, we apply
the harm standard contained in Tex.R.App.P. 44.2(b). Taylor v. State, 74 S.W.3d 457, 467-68
(Tex.App.--Corpus Christi 2002, pet. granted). The trial court made correct statements of law both
before and after the occurrence of the challenged statement, and the trial court's charge correctly
instructed the jury regarding the elements, including the causation element, and the burden on the
State. In the absence of any harm, the asserted error does not require reversal. Accordingly, Issue
Two is overruled.

BLOOD TEST RESULTS


 By two issues, Appellant assigns error in the admission of the blood test results. In Issue
Three, he asserts that the evidence should have been suppressed because the arresting officer did not
reasonably believe that the accident occurred as a result of driving while intoxicated. See
Tex.Transp.Code Ann. § 724.012(b)(1), (2)(Vernon 1999)(providing that a peace officer is
required to take a specimen of a person's breath or blood if the officer arrests the person for an
offense under Chapter 49 of the Penal Code involving the operation of a motor vehicle, and the
person was the operator of a motor vehicle involved in an accident that the officer reasonably
believes occurred as a result of the offense). The State responds that Appellant failed to preserve
this argument by making a timely and specific objection at trial. We agree with the State.

 As a general rule, a defendant must raise a timely and specific objection at trial in order to
preserve error. See Tex.R.App.P. 33.1(a). Further, the complaint on appeal must correspond to the
objection made at trial or it is waived. Trevino v. State, 991 S.W.2d 849, 855 (Tex.Crim.App. 1999). 
When the State offered the blood test results into evidence, the sole objection made by Appellant was
that the State had not presented any extrapolation evidence which would connect the test results to
Appellant's blood alcohol level at the time of the accident. The trial court overruled the objection
and Appellant raises that argument in Issue Five. Because Appellant failed to raise an objection at
trial which comports with the argument made in Issue Three, it is waived. See Montoya v. State, 43
S.W.3d 568, 573 (Tex.App.--Waco 2001, no pet.). Issue Three is overruled.

 In Issue Five, Appellant contends that the blood test evidence is irrelevant and inadmissible
because the blood was drawn three hours after the accident. He argues that in order for the blood
test results to be relevant, the State is required to offer evidence showing what Appellant's blood
alcohol level might have been at the time of the accident. Appellant's argument regarding the
necessity of retrograde extrapolation testimony (2) has been rejected by the courts of this state. See
Beard v. State, 2002 WL 31116936, *3 (Tex.Crim.App. September 25, 2002)(not yet reported);
Mireles v. Texas Department of Public Safety, 9 S.W.3d 128, 132 (Tex. 1999); Price v. State, 59
S.W.3d 297, 300 (Tex.App.--Fort Worth 2001, pet. ref'd); O'Neal v. State, 999 S.W.2d 826, 832
(Tex.App.--Tyler 1999, no pet). Courts in other states have reached the same conclusion. See
Desmond v. Superior Court of Maricopa County, 161 Ariz. 522, 779 P.2d 1261 (1989)(holding test
results admissible without retrograde extrapolation); State v. Barber, 42 Conn.App. 589, 681 A.2d
348 (1996)(same). Accordingly, we overrule Issue Five.

LEGAL AND FACTUAL SUFFICIENCY


 In Issue Four, Appellant challenges the legal and factual sufficiency of the evidence to prove
a casual relationship between Appellant's intoxication and the death of Ronnie Allen.

Legal Sufficiency


 In reviewing the legal sufficiency of the evidence to support a criminal conviction, we must
review all the evidence, both State and defense, in the light most favorable to the verdict to
determine whether any rational trier of fact could have found the essential elements of the offense
beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61
L.Ed.2d 560, 573 (1979); Geesa v. State, 820 S.W.2d 154, 159 (Tex.Crim.App. 1991). This familiar
standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the
testimony, to weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. 
Jackson, 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573. We do not resolve any conflict of fact
or assign credibility to the witnesses, as it was the function of the trier of fact to do so. See Adelman
v. State, 828 S.W.2d 418, 421 (Tex.Crim.App. 1992); Matson v. State, 819 S.W.2d 839, 843
(Tex.Crim.App. 1991). Instead, our duty is only to determine if both the explicit and implicit
findings of the trier of fact are rational by viewing all of the evidence admitted at trial in a light most
favorable to the verdict. Adelman, 828 S.W.2d at 422. In so doing, any inconsistencies in the
evidence are resolved in favor of the verdict. Matson, 819 S.W.2d at 843. Further, the standard of
review is the same for both direct and circumstantial evidence cases. Geesa, 820 S.W.2d at 158.

 A person commits the offense of intoxication manslaughter if the person: (1) operates a
motor vehicle in a public place; (2) is intoxicated; and (3) by reason of that intoxication causes the
death of another by accident or mistake. See Tex.Pen.Code Ann. § 49.08(a). Appellant challenges
only the third element, arguing that there is legally and factually insufficient evidence to show that
he ran the red light as the result of intoxication as opposed to inattention or some other factor. 
Contrary to Appellant's suggestion, the State is not required to prove that intoxication is the sole
cause of the accident. See Tex.Pen.Code Ann. § 6.04 (Vernon 2003)("A person is criminally
responsible if the result would not have occurred but for his conduct, operating either alone or
concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the
result and the conduct of the actor clearly insufficient.").

 Taken in the light most favorable to the verdict, the evidence at trial showed that Appellant
drove his vehicle in excess of the posted speed limit on Doniphan, ran the red light, and collided with
the Allens' minivan without braking or otherwise slowing his vehicle, and without taking any
evasive action whatsoever to avoid the collision. More than one witness testified that it was apparent
Appellant would not stop at the red light since the light had been red for some time and Appellant
had not altered the speed of his vehicle as he approached the intersection. All of this evidence is
probative of a causal connection between Appellant's intoxication and the accident which resulted
in Ronnie Allen's death. Although Appellant argues that the accident may have been caused by
inattentiveness, the jury, having been correctly instructed that intoxication is the loss of normal
mental or physical faculties due to the introduction of alcohol into the body, was free to conclude
that Appellant's obvious lack of normal attention to his surroundings was the result of intoxication. 
This is a reasonable deduction based upon the evidence at trial. Accordingly, we conclude that a
rational trier of fact could have reasonably found a causal connection between Appellant's
intoxication and the accident which caused Ronnie Allen's death. The jury's verdict is supported
by legally sufficient evidence.

Factual Sufficiency


 When conducting a review of the factual sufficiency of the evidence, we consider all of the
evidence, both admissible and inadmissible, but we do not view it in the light most favorable to the
verdict. Clewis v. State, 922 S.W.2d 126, 129 (Tex.Crim.App. 1996); Levario v. State, 964 S.W.2d
290, 295 (Tex.App.--El Paso 1997, no pet.). We review the evidence weighed by the jury that tends
to prove the existence of the elemental fact in dispute and compare it with the evidence that tends
to disprove that fact. Johnson v. State, 23 S.W.3d 1, 7 (Tex.Crim.App. 2000); Jones v. State, 944
S.W.2d 642, 647 (Tex.Crim.App. 1996), cert. denied, 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d 54
(1997). A defendant challenging the factual sufficiency of the evidence may allege that the evidence
is so weak as to be clearly wrong and manifestly unjust, or in a case where the defendant has offered
contrary evidence, he may argue that the finding of guilt is against the great weight and
preponderance of the evidence. See Johnson, 23 S.W.3d at 11. Although we are authorized to set
aside the fact finder's determination under either of these two circumstances, our review must
employ appropriate deference and should not intrude upon the fact finder's role as the sole judge of
the weight and credibility given to any evidence presented at trial. See Johnson, 23 S.W.3d at 7. We
are not free to reweigh the evidence and set aside a verdict merely because we feel that a different
result is more reasonable. Cain v. State, 958 S.W.2d 404, 407 (Tex.Crim.App. 1997); Clewis, 922
S.W.2d at 135.

 In the context of the factual sufficiency argument, Appellant asserts, without providing any
citations to the record, that there exist certain facts which put into question his intoxication at the
time of the accident. We assume Appellant makes reference to the passage of approximately two
hours and forty-five minutes between the accident and the drawing of Appellant's blood. In their
weighing of the evidence, the jury had the ability to take into account the passage of time on the
blood test results. It is doubtful, however, that the jury gave the blood test results no credence
whatsoever. Even assuming they did, there is evidence demonstrating Appellant was intoxicated at
the time of the accident. Immediately after the accident, witnesses saw beer bottles in Appellant's
truck with some of them empty, some full, and others opened and partially empty. Mrs. Carrillo was
seen attempting to kick the beer bottles underneath the truck in an apparent effort to hide or dispose
of evidence. While some witnesses smelled alcohol around the vehicle as the result of broken
bottles, one police officer smelled alcohol on Appellant's breath and person as he was being loaded
into the ambulance. Other witnesses smelled alcohol on Appellant's breath at the hospital and one
police officer concluded that Appellant was still slightly intoxicated the morning following the
accident. At least two police officers formed the opinion that Appellant was intoxicated at the scene
of the accident. While some of Appellant's difficulty with standing may be explained as the result
of him being dazed from the accident, it is difficult to find an explanation other than intoxication for
his urinating on the side of his truck. Based upon our review of all of the evidence, we find the
evidence factually sufficient to support the jury's finding that Appellant was intoxicated.

 Turning to Appellant's argument regarding the causal relationship between his intoxication
and the accident, the record contains evidence revealing that Appellant's inattention on this evening
was due to his level of intoxication. Appellant additionally argues that there is evidence that the
intersection is a dangerous one and accidents there were common. One of the eyewitnesses to the
accident who travels through the intersection several times a week, offered his opinion that the
intersection is not particularly dangerous. He observed that the intersection is well-lighted and the
traffic control device is completely visible. Even if the jury believed the testimony that the
intersection is a dangerous one such that it amounted to a concurrent cause of the accident, the
evidence does not show that the concurrent cause was clearly sufficient to produce the result and the
conduct of the actor clearly insufficient. See Martinez v. State, 66 S.W.3d 467, 469-70 (Tex.App.--Houston [1st Dist.] 2001, pet. ref'd)(although defendant's vehicle had safety violations and may have
been improperly loaded, proof of defendant's intoxication was factually sufficient to support
conviction for intoxication manslaughter). Accordingly, the evidence is factually sufficient to
support the jury's verdict. Issue Four is overruled. Having overruled all five issues, we affirm the
judgment of the trial court.


April 17, 2003 

 ANN CRAWFORD McCLURE, Justice


Before Panel No. 2

Barajas, C.J., McClure, and Chew, JJ.


(Do Not Publish)
1. A person commits intoxication manslaughter if he operates a motor vehicle in a public place and is
intoxicated, and by reason of that intoxication causes the death of another by accident or mistake. Tex.Pen.Code Ann.
§ 49.08 (Vernon 2003).
2. Retrograde extrapolation is the computation back in time of the blood-alcohol level--that is, the estimation
of the level at the time of driving based on a test result from some later time. Mata v. State, 46 S.W.3d 902, 908-09
(Tex.Crim.App. 2001).